803 So.2d 1021 (2001)
SUCCESSION OF Clyde William MILLER, Jr.
No. 35,244-CA.
Court of Appeal of Louisiana, Second Circuit.
December 7, 2001.
Rehearing Denied January 17, 2002.
*1022 Charles W. Strickland, W. Jarred Franklin, Shreveport, Counsel for Appellant, Neely Joyce LaFranier Miller.
Burt A. Bowers, Francis M. Gowen, Jr., Shreveport, Counsel for Appellee, Jeffrey Duane Miller.
Before WILLIAMS, STEWART and DREW, JJ.
WILLIAMS, Judge.
In this action to annul a notarial testament, the petitioner, Neely Joyce Miller, appeals a judgment in favor of the Succession of Clyde William Miller, Jr. The trial court found that the evidence failed to establish that the testator was subject to undue influence or that he lacked testamentary capacity. The court granted in part petitioner's motion for new trial, assessing all court costs to the succession. For the following reasons, we affirm.

*1023 FACTS
In December 1995, Clyde William Miller, Jr. ("Miller") and Neely Joyce LaFranier Miller ("Neely") were married and established a residence in Shreveport. Neely prepared meals, washed laundry, performed yard work and cared for livestock. According to Neely, Miller was diagnosed with terminal pancreatic cancer in the Spring of 1998 and began to make financial plans. Miller made certain financial provisions for his adopted son, Jerry Miller, his son's children and for his wife's children and grandchildren. Miller instructed his step-daughter, Karla Stanford, to prepare his will and a power of attorney granting his wife the authority to handle his affairs should he become unable. In July 1999, Miller signed the power of attorney and executed his last will and testament, which bequeathed his entire estate to his wife and named Jerry Miller as the alternate beneficiary.
Over time, Miller's physical and mental condition declined as a result of the cancer. In August 1999, he was advised not to drive by his physician, Dr. Cassiere. In September 1999, Miller was injured after a fall at home and he was treated at the VA Hospital. On September 8, 1999, Neely withdrew Miller's certificate of deposit of $61,955 from Hibernia Bank and paid off her mobile home loan of $20,234. Neely then went to Home Federal Savings and Loan and withdrew $105,351 of Miller's money. She next went to Regions Bank and withdrew $9,686. The total of these withdrawals was $176,992. She also purchased money orders of $10,000 for each of her three children and money orders of $5,000 for each of her three grandchildren.
On September 9, 1999, Neely signed a coroner's commitment order after alleging that Miller had threatened to harm her and himself. Miller was transported to LSU Medical Center. The examining physicians found that Miller's condition did not require interdiction and he was released. The next day, Miller was admitted to Schumpert Medical Center, where he remained until September 13, 1999. The attending psychiatrist, Dr. Gary Booker, noted that Miller's problems seemed related to domestic difficulty. While at Schumpert, Miller contacted attorney Burt Bowers seeking assistance to get out of the hospital. Neely closed out Miller's investment accounts of $25,726 before his release from the hospital. Miller was taken to Willis-Knighton Hospital on September 14, 1999. The medical records show that he was lucid and coherent. On that date and two days later, Neely made separate withdrawals of over $19,000 from Miller's accounts.
The parties gave conflicting accounts of the events of September 16, 1999. According to Neely, after having an argument with Miller on September 14, she left for the night to avoid further conflict and then traveled to Arkansas to visit a relative. When she returned from her trip on the 16th, she found that Miller's grandson, Jeffrey Miller, had moved into Miller's house and she was prevented from seeing her husband. Jeffrey Miller asserts that Neely moved out of Miller's residence on September 16, 1999, and that he was asked by his grandfather to move in and provide him with care. Jeffrey Miller became Miller's primary care giver.
On September 22, 1999, Miller was accompanied by his grandson when he visited the office of attorney Bowers concerning the unauthorized withdrawals of approximately $240,000 of Miller's money by Neely. Miller revoked the power of attorney to his wife. In October 1999, Miller filed a petition for divorce. On October 7, 1999, Neely went to see Miller at his house with a sheriffs deputy. Bowers told the deputy that a divorce petition had been filed and Neely was *1024 asked to leave the premises. Miller was unable to verbally respond to Neely, but he was described by the hospice nurse as being agitated during her visit.
Miller's appointment with Bowers to execute a new will, scheduled for the next morning, was hastily changed to that evening of October 7. At approximately 10 p.m., Bowers arrived with several witnesses to have Miller execute his will and a power of attorney. Bowers, who was also acting as notary, read the will aloud in its entirety to Miller, who had been medicated earlier and was unable to get out of bed. Bowers later stated that upon completion of the reading, Miller was asked if the instrument which had been read was his last will and testament, to which Miller responded by nodding his head and trying to verbalize words. The will provisions bequeathed all of Miller's assets to his grandson, Jeffrey Miller.
As confirmation of his intent, Bowers asked Miller to squeeze his hand in response to the same question. Miller then signed the will, with his grandson holding his arm, in the presence of the notary and witnesses. Miller also executed a power of attorney in favor of his grandson. Miller died the following night at 12:55 a.m. on October 9, 1999.
Two days later, Jeffrey Miller, the executor of the estate of the decedent, Clyde Miller, filed a petition for recognition of the notarial testament of the decedent. Neely filed a petition to annul the notarial testament dated October 7, 1999, for recognition of the testament dated July 30, 1999, and to remove Jeffrey Miller as testamentary executor.
After a trial, the court denied the petition to annul the notarial testament. The trial court found that Neely failed to establish by clear and convincing evidence that the decedent was subject to undue influence or that he lacked testamentary capacity at the time he executed his will of October 7, 1999. Neely filed a motion for new trial, which was denied in part and granted in part to assess all court costs to the Succession of Clyde William Miller, Jr. Neely appeals the judgment.

DISCUSSION
Neely Miller contends the trial court erred in finding that the evidence failed to prove that decedent lacked testamentary capacity. She argues that the medication given to the decedent and his psychological condition prevented him from having capacity to execute the will on October 7, 1999.
All persons have capacity to give and receive donations mortis causa, except as expressly provided by law. LSA-C.C. art. 1470. There is a presumption in favor of testamentary capacity, which means that the donor must be able to comprehend generally the nature and consequences of the disposition that he is making. LSA-C.C. art. 1477; Succession of Lyons, 452 So.2d 1161 (La.1984); Cupples v. Pruitt, 32,786 (La.App.2d Cir.3/1/00), 754 So.2d 328. A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity when the donation was made or the testament executed. LSA-C.C. art. 1482; Lyons, supra.
The issue of capacity is factual in nature and the ultimate finding that the testator possessed or lacked capacity cannot be disturbed on appeal unless clearly wrong. The court may consider medical evidence, other expert testimony and lay testimony in evaluating mental capacity. Cupples, supra.
Each party presented testimony from a medical expert, neither of whom had personally treated the decedent. Neely Miller's witness, Dr. Thomas Reilly, was accepted as an expert in geriatrics and internal medicine. Dr. Reilly testified *1025 that he reviewed the hospice nurse's notes, which indicated that on October 6, 1999, decedent was given a 72-hour time release duragesic patch, which administered a strong narcotic for pain.
The notes showed that on October 7, 1999, at 9:30 a.m. the decedent received an injection of Haldol 5 mg, a strong antipsychotic medicine and application of Ativan 2mg, a sedative. Dr. Reilly stated that the half-life of Haldol and Ativan is approximately 2-6 hours, so that the medication could have been out of decedent's system by 4:15 p.m. However, Dr. Reilly explained that because decedent's condition involved pancreatic metastasis into his liver, his metabolizing of the drugs was likely quite prolonged, and so the effects of the drugs would have lasted longer in his system than in that of an average person.
Dr. Reilly noted that at 4:15 p.m., a hospice nurse described decedent as semicomatose, disoriented, agitated, nonverbal and lethargic. Dr. Reilly stated that because decedent received another dose of Haldol and Ativan at 4:30 p.m., it was unlikely that the effects of the medication would have worn off by 10:00 p.m. that evening. Considering the decedent's condition at 4:15 p.m., Dr. Reilly concluded that his status at 10:00 p.m. would have been the same. Thus, Dr. Reilly opined that decedent could not have been competent to execute a will independently at that time and did not have the capacity to understand his act. Reilly also testified that he saw the signature on the will and expressed the opinion that someone as "toxic" as decedent could not have written his name so clearly.
The succession's witness, Dr. Paul Ware, was accepted as an expert in the fields of psychiatry and forensic psychiatry. Dr. Ware testified that he had reviewed the medical records and reports and had interviewed Jerry and Jeffrey Miller. Dr. Ware stated that the Haldol would not have prevented decedent from understanding that he was signing a will and explained that Ativan is a short-acting benzodiazepine of the Valium family. Dr. Ware opined that if the dosage given did not sedate the decedent and put him to sleep, Ativan would not significantly affect his cognition.
Ware testified that he thought the hospice nurse overstated decedent's condition by describing him as semicomatose, since her notes did not indicate that she attempted to rouse decedent by applying pressure to his sternum. Dr. Ware stated that Bowers' method of having decedent nod his head and squeeze with his fingers indicated that he could comprehend those commands, that he understood the information and could respond. Dr. Ware opined that on October 7, 1999, the decedent was mentally competent to be aware of his assets and to understand what he wanted to do with his property.
Dale Karr, attorney Bowers' father-in-law, testified that he went to decedent's house to witness the will signing. Karr stated that he saw decedent in bed, raised to a sitting position, and that decedent made utterances that were audible but not understandable. Karr testified that Bowers read the will aloud to decedent, who nodded his head when asked if he understood the will. Karr stated that Bowers then instructed decedent to squeeze his hand if he understood and decedent did so. Karr testified that he observed decedent sign the will with his left hand while his arm was supported by his grandson.
Bowers' secretary, Jane Falgout, and his wife, Jennifer Bowers, testified that they were present as witnesses at the will signing. They each stated that they received a copy of the will and followed along as it was read aloud. Falgout and Jennifer Bowers testified that decedent nodded and then squeezed the attorney's hand to indicate *1026 that he understood the will. Each witness stated that she observed decedent sign the will.
Burt Bowers testified that when he arrived at decedent's house and asked if he was ready to hear the will read, decedent said the word "yes," but after that point his words were garbled. Bowers stated that to confirm decedent's wishes after the will was read, he asked him to squeeze his hand if that was what he wanted and that decedent squeezed his hand. Bowers testified that decedent wanted to sign his own name and that he lifted his left hand when Bowers attempted to give him the pen in his right hand. Bowers observed decedent grip the pen and sign his name on the will. Bowers testified that based on his observations, he believed decedent understood what he was doing when he signed the will.
Neely Miller argues that Dr. Ware's testimony should not have been relied on because when he testified he was unaware of medication dosages given to decedent. However, Dr. Ware stated that he had reviewed the medical records and hospice notes, which listed the doses and types of medication administered, prior to forming his opinion. In addition, Dr. Reilly's statement, that a person under the influence of narcotic substances could not have signed his name as clearly as decedent's signature, could be interpreted as an indication that decedent was not impaired by the medication at the time he signed the will.
Neely Miller contends the trial court erred in not considering that decedent required hearing aids and in finding that the witnesses to the October 1999 will were disinterested observers. The testimony was conflicting with regard to decedent's need for a hearing aid and there was no indication that decedent experienced difficulty hearing at the time the will was read aloud. Regarding the possible self-interest of the witnesses, we note that none of them were donees under the will and that other than Bowers' earning of attorney fees, the evidence does not show how the witnesses gained financially from the will.
The trial court heard the conflicting medical expert testimony and weighed the credibility of the witnesses. The parties presented competing theories concerning the meaning of the evidence. The trial court found that the succession expert and the witnesses to the will signing were credible and this determination was supported by the evidence. Based upon this record, we cannot say the trial court was clearly wrong in finding that Neely Miller failed to overcome the presumption of decedent's capacity to make a will with clear and convincing evidence of his testamentary incapacity at the time the October 1999 will was signed. The assignment of error lacks merit.

Undue Influence
Neely Miller contends the trial court erred in finding that the evidence failed to prove that the testator's will of October 1999 was the result of undue influence. She argues that decedent's execution of a will leaving his entire estate to Jeffrey Miller, despite their previous hostile relationship, shows that decedent was improperly influenced by his grandson.
A donation mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the donor's volition as to substitute the volition of the donee or other person for that of the donor. LSA-C.C. art. 1479. Mere advice, persuasion or kindness and assistance should not constitute influence that would destroy the free agency of a donor and substitute another's volition for his own. Article 1479, Revision Comment (b).
A person who challenges a donation because of undue influence must prove it *1027 by clear and convincing evidence unless the wrongdoer was not related to the donor by marriage, blood or adoption. LSA-C.C. art. 1483. The district court's finding of whether there was undue influence is fact intensive and cannot be disturbed on appeal in the absence of manifest error. Cupples, supra.
In the present case, James Henderson testified that on September 10, 1999, he received a telephone call from decedent, who was in the hospital and asked for the name and phone number of their church's attorney. Bowers stated that the next morning he was contacted by decedent, who was seeking help to get out of the hospital. Danielle Norton testified that on September 16, 1999, at the hospice intake interview, the decedent stated that he was in the process of changing the executor of his will and the power of attorney. Bowers stated that at their meeting on September 22, 1999, the decedent said that he wanted to revoke the power of attorney to his wife, he wanted his money returned and wanted a divorce. Bowers testified that on September 30, 1999, he was instructed by decedent to prepare a new will.
Neely Miller asserts that Jeffrey Miller used his position as primary care giver to improperly influence decedent's wishes. However, the evidence shows that by the time Jeffrey Miller moved into decedent's home on September 17, 1999, decedent had already contacted attorney Bowers about his situation. The trial court found that at a time when decedent was recognized as competent, he indicated his intent to change his financial situation by arranging to revoke the power of attorney in favor of his wife and to make a new will. The court determined that the decedent's execution of the will and power of attorney on October 7, 1999, was consistent with his previously expressed intent. After reviewing the record, we conclude that the evidence supports these factual findings. Consequently, we cannot say the trial court was clearly wrong in finding that Neely Miller failed to prove by clear and convincing evidence that decedent was subject to undue influence when he signed the will in October 1999. The assignment of error lacks merit.

Answer to the Appeal
The succession filed an answer to the appeal asserting that the court erred in finding that all court costs and expert witness fees should be assessed to the succession. LSA-C.C.P. art.1920 provides that the court may render judgment for costs against any party as deemed equitable. The allocation of court costs among the parties is a matter which is subject to the discretion of the trial court and its allocation of those costs will not be disturbed absent evidence of an abuse of that discretion. McConathy v. McConathy, 25,542 (La.App.2d Cir.2/23/94), 632 So.2d 1200, writ denied, 94-0750 (La.5/6/94), 637 So.2d 1052.
In the present case, there was a reasonable evidentiary basis for the appellant's challenge of the validity of the will signed on October 7, 1999. The trial court found that the issue of testamentary capacity was a close case. After reviewing the record, we cannot say the trial court abused its discretion in assessing all court costs, including expert witness fees, to the succession. The assigned error lacks merit.

CONCLUSION
For the foregoing reasons, the trial court's judgment and the order granting in part the motion for new trial are affirmed. Costs of this appeal are assessed equally to the appellant, Neely Joyce LaFranier Miller and the appellee, Jeffrey Miller, individually and in his capacity as executor *1028 of the Succession of Clyde William Miller, Jr.
AFFIRMED.

APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, GASKINS, PEATROSS, and DREW, JJ.
Rehearing denied.