915 So.2d 415 (2005)
SUCCESSION OF Jo Green PARDUE.
No. 40,177-CA.
Court of Appeal of Louisiana, Second Circuit.
November 8, 2005.
Rehearing Denied December 8, 2005.
*416 Bernard S. Johnson, Shreveport, for Appellant, Charles Larry Platt.
John M. Frazier, for Appellee, First Baptist Church of Shreveport.
*417 Jay A. Greenleaf, Shreveport, for Appellee, First Baptist Church of Shreveport and Robert V. Herndon.
Before WILLIAMS, STEWART and LOLLEY, JJ.
WILLIAMS, Judge.
Charles Platt appeals a judgment in favor of First Baptist Church of Shreveport and Robert Herndon, declaring the May 2002 notarial will executed by Jo Green Pardue to be a nullity. The trial court found that Pardue lacked testamentary capacity and was subject to undue influence when she executed the notarial will. For the following reasons, we affirm.

FACTS
The decedent, Jo Green Pardue, was a 102-year-old retired teacher residing in Shreveport at the time of her death on December 20, 2003. Decedent died leaving two purported wills. One was an olographic will executed in December 1989, naming the First Baptist Church of Shreveport ("FBC") as the universal legatee. The other was a notarial will executed in May 2002, leaving her entire estate to Charles Platt ("Platt").
The decedent first met Platt during the 1990s when he stopped at her house, which was being painted by his brothers. Thereafter, Platt maintained contact with the decedent by driving her to do errands. Platt accepted money from decedent to repair his vehicle and to arrange various repairs of her house and appliances. From 1998 through 2001, Platt visited decedent at her house an average of one to two times per week. During this period, Platt began to write checks that were signed by decedent, including numerous checks payable to himself. In its written reasons for judgment, the trial court found as fact the following "chronological events of significance:"
 February 2001-Robert Herndon, a close friend, learned that Pardue's phone service had been terminated for non-payment of her bill. Pardue was not aware her phone service had been turned off.
 March 15, 2001-At her 100th birthday party, Pardue did not recognize her sister-in-law Robbie Litton. Pardue had made a bequest to Litton in her 1989 will. Cara Lee Smith, a social worker and long-time friend of Pardue, noticed a decline in Pardue's mental acuity and appearance.
 April 25, 2001-Pardue signed a power of attorney in favor of Herndon to allow him to help her with paying bills and manage her checkbook. Thereafter, Herndon went to Pardue's home once or twice a week to assist her with paying bills. A review of Pardue's checking records showed that between August 2000 and April 2001, Platt had received $8,200 in checks from Pardue. The payee on many of those checks was written in by Platt.
 Summer 2001-From June to August 2001, Pardue wrote six checks payable to "W. L. Hayes" for a total of $5,500. However, when Herndon asked her about these checks, Pardue was unable to give him any explanation or detail.
 August 2001-Norma Easley, in her capacity as treasurer of Delta Kappa Gamma, received a bank deposit slip that Pardue had written out as a check to pay the sorority dues. Easley expressed her concern about Pardue's well-being to Herndon.
 Fall 2001-Winter 2002-Pardue was disoriented and became lost in the church she had been familiar with for decades. Pardue began to exhibit difficulty in dressing herself. On one occasion, she wore a house dress under *418 a coat, on another she appeared at Sunday school wearing pants under an inside-out dress. When asked why she was wearing pants, Pardue said that after church she was going fishing with her husband, who had died in 1976. Elizabeth Wheeler, Pardue's Sunday school teacher, said that although previously Pardue actively participated in class, during this time she began to exhibit lethargy and often fell asleep in class.
 January 2002-When Mary Ann Herndon went to pick up Pardue for a funeral, Pardue was unkempt, was wearing pants under her dress and did not seem to understand what was happening. After the funeral, Pardue was very hungry and she ate all of her food quickly. Herndon worried Pardue was not feeding herself properly.
 March 15, 2002-Mrs. Herndon and her grandchildren went to Pardue's house to celebrate her 101st birthday. Pardue was wearing an old house dress and was not groomed. The kitchen was dirty and Pardue did not seem to understand that it was her birthday.
 April 9, 2002-Annie Savage went to Pardue's home to pick her up for a meeting, but she could not open the back door. When Savage asked for a key, Pardue offered her an ice pick, a fork and a hairbrush.
 Spring-Summer 2002-Michael Mason had done yard work for Pardue for seven years, but on two occasions she did not recognize him. Once, when Mason went to the door for payment, Pardue looked for her checkbook in the breadbox and the oven. Mason expressed his concern about Pardue to Herndon.
 May 14, 2002-Platt drove Pardue to the office of Robert Booth, a notary and realtor. Pardue signed an affidavit giving Platt authority to assist her with finances.
 May 28, 2008-Platt told Pardue he could not assist her in staying out of a nursing home without a power of attorney. He called attorney George Hayes and handed the telephone to Pardue to make an appointment.
 May 29, 2002-Platt drove Pardue to Hayes' office to have him prepare a power of attorney in favor of Platt. Hayes met with Pardue for 30 minutes and he asked if she wanted him to prepare a will for her. Platt was in the room at all times.
 May 30, 2002-Pardue signed a will leaving her estate to Platt and gave him a power of attorney. Pardue signed the will "Jo Green Pardue, Jr." Sabrina Henderson, John Simms and Teresa Classen spoke with Pardue at Hayes' office.
 June 2002-Platt presented the power of attorney to AmSouth Bank, which refused to honor the document. The bank advised Herndon of the Platt power of attorney.
 July 11, 2002-The Herndons, attorney Roy Beard and Lilyan Hanchey met at Pardue's home. Pardue pointed to Robert Herndon when asked who she wanted as her power of attorney. Pardue signed the revocation of Platt's power of attorney.
 July 15, 2002-Pardue signed another power of attorney in favor of Platt.
 July 16, 2002-Charles Upchurch, security officer at AmSouth, met at Pardue's home with Pardue, Herndon, Hayes and Platt. Upchurch intended to notify Pardue that the bank was closing her account because of the dual powers of attorney, but did not do so when Platt agreed to resign his power of attorney. Pardue did not recognize *419 Herndon. After the meeting, Upchurch contacted the Governor's Office of Elderly Protective Services to report possible financial exploitation of Pardue by Platt. Robin Smith, a social worker with the state, visited Pardue at her home and administered a mental status questionnaire.
 July 30, 2002-Smith held a meeting with Herndon and Platt. Herndon presented the 1989 will, but Platt did not mention the May 2002 will. Platt agreed to resign his power of attorney.
 July 31, 2002-Pardue was examined by Dr. Michelle Self. Although Dr. Self did not perform a mental status assessment, she noted that Pardue seemed "pleasantly demented."
 August 7, 2002-Pardue was taken to the emergency room suffering from dehydration. Nurse's notes indicated her clothes were dirty and unkempt, she had worn the same clothes for a week and her personal hygiene was poor.
 August 2002-Pardue moved into Montclair Assisted Living Facility. While there, she wandered the halls, dressed improperly, went into other residents' rooms without invitation and took objects that belonged to others.
 December 20, 2003-Pardue died.
In February 2004, Herndon filed a request to probate the decedent's 1989 olographic testament and obtained an order from the district court stating that the will was filed and executed in accordance with the law and confirming Herndon as executor. In May 2004, Platt filed a motion for a judicial declaration that the 2002 will superseded the 1989 will, that Herndon be removed as executor and that Billy Platt be appointed executor. Herndon filed an answer alleging that the 2002 notarial will was invalid on the grounds that decedent lacked the mental capacity to execute that will and was subject to undue influence. FBC filed a petition to annul the testament alleging that the 2002 will was null due to decedent's lack of capacity and the undue influence exerted by Platt.
After hearing testimony from 30 witnesses in a four-day trial, the court issued extensive oral and written reasons for judgment finding that the medical opinions of Drs. David Henry and Paul Ware established that decedent suffered from moderate dementia and did not possess testamentary capacity when she signed the May 2002 will. In addition, the court found that decedent's dementia made her particularly vulnerable to the influence of Platt, who had been convicted in 1987 of felony theft from an elderly victim. The court concluded that FBC and Herndon proved by clear and convincing evidence that decedent lacked testamentary capacity on May 30, 2002, and that Platt exerted undue influence over the decedent so as to substitute his volition for that of decedent. The court rendered judgment in favor of FBC and Herndon, declaring that the 2002 will was a nullity. Platt appeals the judgment.

DISCUSSION
Platt contends the trial court erred in admitting the expert testimony of Dr. Paul Ware. Platt argues that Dr. Ware's testimony should have been excluded because the method he used was not sufficiently reliable under the standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill or experience may testify thereto in the form of an *420 opinion. LSA-C.E. art. 702. The admission of expert testimony is proper when the following three factors are established: (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert, and (3) the testimony assists the trier of fact through the application of scientific, technical or specialized expertise. Cheairs v. State DOTD, 03-0680 (La.12/3/03), 861 So.2d 536.
In Daubert, the court established factors for evaluating the methodology employed by expert witnesses, including the "testability" of the scientific theory or technique, whether the technique has been subjected to peer review and publication, the known or potential rate of error, and whether the methodology is generally accepted in the scientific community. A district court is accorded broad discretion in determining whether expert testimony is admissible and who should be permitted to testify as an expert. Cheairs, supra. A district court's decision to qualify an expert will not be overturned absent an abuse of discretion. Cheairs, supra.
In the present case, Dr. Ware testified that the best way to do a mental status examination of a person who is not present or deceased is to gather as much information as possible about the person's prior functioning in life with a particular focus on her functioning at the time in question. Ware explained that such information about the person is obtained from others who were close to, or who spent significant time with the person, such as family or friends, and by reviewing available medical records. Ware stated that this is an accepted method in the psychiatry field. Ware testified that in evaluating Pardue's mental state at the time of the May 2002 will, he reviewed a number of documents, including depositions, witness statements and medical records. Dr. Ware stated that he was familiar with the term "psychological autopsy," which he said refers to a method of reconstructing a deceased person's mental and physical functioning at a particular time. Ware testified that the psychological autopsy method was "essentially" the same assessment method he used and additionally, he attended the trial and listened to the witness testimony.
Dr. George Seiden, a psychiatrist, testified that he evaluated Pardue's mental status by using the technique of psychological autopsy, which he described as a method that involves obtaining information about the deceased person from as many sources as possible, including medical records and statements of those who knew the person. Dr. Seiden stated that in a testamentary capacity case, the focus is on the person's mental status at the time the contested will was created. Dr. Seiden testified that in evaluating Pardue's mental status, he had reviewed her medical records, the depositions, affidavits and recorded statements of witnesses and had interviewed Platt.
In his brief, Platt argues that Dr. Ware did not properly conduct a psychological autopsy because in forming his opinion he ignored the testimony of witnesses John Simms, Teresa Classen and Sabrina Henderson, who had observed Pardue's conduct, conversation and appearance at the time she signed the May 2002 will. Dr. Ware acknowledged that he had not interviewed or obtained statements from those witnesses in preparing his initial report. However, Dr. Ware stated that before testifying at trial, he was aware that Simms and Henderson had stated in affidavits that they believed Pardue was capable of understanding her act of signing the will in May 2002. In addition, Dr. Ware *421 testified on rebuttal that hearing the testimony of those witnesses had not changed his opinion that Pardue lacked capacity on May 30, 2002.
We note that Dr. Seiden testified that the psychological autopsy method has been described and validated in a number of peer reviewed psychiatric journals. The record shows that Dr. Ware and Dr. Seiden each reviewed medical records and witness depositions and statements in reaching their conclusions regarding Pardue's testamentary capacity. Thus, since the technique employed by Dr. Ware was substantially the same as the psychological autopsy method, which is generally accepted in the psychiatric field, the trial court could reasonably have found that Dr. Ware's methodology was sufficiently reliable under the Daubert standard. Consequently, we cannot say the trial court abused its discretion in admitting Dr. Ware's expert testimony. The assignment of error lacks merit.

Testamentary Capacity
Platt contends the trial court erred in finding that Pardue lacked testamentary capacity when she signed the May 2002 will. Platt argues that evidence of Pardue's dementia at the approximate time the will was executed is not sufficient to prove lack of capacity when the witnesses who observed Pardue at the time she signed the will testified she was competent.
There is a presumption in favor of testamentary capacity. Succession of Lyons, 452 So.2d 1161 (La.1984). Testamentary capacity means the donor must be able to comprehend generally the nature and consequences of the disposition that he is making. LSA-C.C. art. 1477. However, a person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity when the testament was executed. LSA-C.C. art. 1482; Cupples v. Pruitt, 32,786 (La.App. 2d Cir.3/1/00), 754 So.2d 328, writ denied, 00-0945 (La.5/26/00), 762 So.2d 1108. The issue of capacity is factual in nature and the district court's finding that the testator possessed or lacked capacity will not be disturbed unless plainly wrong. Cupples, supra. The court may consider medical evidence, other expert testimony and lay testimony in the evaluation of mental capacity. Cupples, supra.
Mary Ann Herndon, the wife of Robert Herndon and a retired teacher, testified that she met Pardue in 1965 at a church activity. Herndon stated that Pardue was a good friend and they visited each other's homes. Herndon testified that she began to notice a change in Pardue's physical appearance and mental condition shortly before her 100th birthday in March 2001. Herndon stated that Pardue's attention to her hygiene and clothing noticeably declined, whereas previously she took great pride in her appearance and she was always dressed nicely with her hair in place. Herndon testified that in February 2001, she and her husband learned that Pardue's phone had been disconnected for failure to pay her bill. Herndon stated that in April 2001, her husband obtained a power of attorney to help Pardue with mailing her bill payments. Herndon testified that in January 2002 she picked up Pardue for a friend's funeral and was very concerned about her appearance because Pardue's hair was not combed and she wore pants under her skirt. At the funeral Pardue did not seem to know why she was there and afterward, Pardue said she was very hungry and quickly ate all of her food, causing Herndon concern that Pardue was not eating enough. Herndon stated that in March 2002, she and her grandchildren brought a cake to Pardue's home to celebrate her *422 101st birthday. Pardue was wearing a stained house dress and old tennis shoes and she was not aware that it was her birthday. Herndon stated that Pardue would not have dressed that way in previous years.
Annie Savage, a retired teacher, testified that she and Pardue were members of the same church and of the Delta Kappa Gamma teacher organization. Savage stated that she considered Pardue a friend who had been intelligent and well-organized up until the last several years of her life. Savage testified that on April 9, 2002, she went to Pardue's house to pick her up for a meeting, but Pardue was unable to open the back door. Savage said that after entering by the front door, she asked Pardue for a key to the back door and Pardue said try this and handed Savage an ice pick, a knife, a fork and a hairbrush. Savage stated that Pardue's clothes were not neat, her stocking was hanging down and her hair was uncombed. Savage testified she was so taken aback by Pardue's confusion that she later noted the incident in her daily journal.
Dr. David Henry, who was accepted as an expert in geriatrics and family medicine, testified that dementia is the deterioration of a person's mental capacity for various medical reasons, shown by loss of short-term memory and by loss of executive, or decision-making, function. Dr. Henry stated that he made a posthumous assessment of Pardue's mental status by extracting information from depositions, witness statements and the report of Robin Smith of the Office of Elderly Protective Services. Dr. Henry testified that he gave significant weight to the description of Pardue by those who had known her for a long period of time. Dr. Henry stated that those persons indicated that late in the year 2000 Pardue began to deteriorate in her thinking ability and personal appearance. Dr. Henry testified that a chart describing the seven stages of dementia was widely accepted in the scientific literature. Dr. Henry stated that on May 30, 2002, the evidence showed that Pardue was in stage 5, moderately severe cognitive decline, with elements of stage 6, severe cognitive decline, as illustrated by incidents where she used a bank deposit slip as a check and tried to use a knife or hairbrush instead of a key to open her door.
Dr. Henry opined that as a result of her dementia, it was "highly unlikely" that Pardue could have understood the nature and consequences of the will she signed on May 30, 2002. Dr. Henry testified that although witnesses stated that Pardue seemed to be able to understand what she was doing on that date, they did not have a meaningful opportunity to assess Pardue's capacity and their perceptions were outweighed by the testimony of those who had known Pardue the longest and who had described her increasing dementia. In addition, Dr. Henry stated that Pardue's 1989 olographic will showed her organizational thinking pattern as highly organized and meticulous, since she made bequests of specific items of property to identified individuals and charities. However, Dr. Henry pointed out that Smith reported that by July 2002, Pardue did not know information about her bank accounts, did not know how her bills were paid, did not recognize the names of either Herndon or Platt and did not remember signing the powers of attorney.
Dr. Paul Ware, who was accepted as an expert in general and forensic psychiatry, testified that in cases involving a person's capacity to make a will, an evaluation involves an assessment of whether the person has the ability to understand the extent of her assets, the existence of any living relatives and the disposition of property *423 at death. Dr. Ware stated that a disturbance of a person's cognitive ability is shown by agnosia, which is the failure to recognize or identify ordinary objects and was illustrated by Pardue's attempt to use an icepick or hairbrush instead of a key to open a door. Dr. Ware explained that another cognitive disturbance was diminished executive functioning, which is the ability to perceive the present situation and organize a plan for the future. Dr. Ware testified that witness testimony describing changes in Pardue's behavior and awareness supported an opinion that Pardue's level of dementia in May 2002 meant she did not have testamentary capacity. Dr. Ware noted that the incident in August 2001, when Pardue wrote on a bank deposit slip as if it were a check, was very significant in showing the degree of Pardue's mis-perception and her reduced level of awareness regarding financial matters. Dr. Ware stated that the difference in detail between the wills of 1989 and 2002 was significant because the earlier will showed that Pardue was very aware of her assets and the manner in which they would be distributed at her death, whereas Pardue did not even discuss her assets with attorney Hayes at the time of the later will.
Dr. Ware acknowledged that the statement of Pardue's investment advisor, Tommy Thigpen, that Pardue was making investment decisions in June or July 2002, was difficult to reconcile with other testimony. However, Dr. Ware noted that an investment advisor's encounter with elderly clients often involved making a recommendation and then asking if the elder agreed, so that the situation only required a yes or no answer and did not show the elder's actual comprehension. Ware stated that similarly, the witnesses who saw Pardue sign the will on May 30, 2002, were reacting to a 101-year-old woman who appeared energetic and sharp, but no one asked specific questions to determine if Pardue really understood the implications of her act. Dr. Ware believed that Pardue was particularly susceptible to influence in May 2002 because of her concern about going to a nursing home and was thus vulnerable to someone, such as Platt, who offered her assistance to avoid that event. Dr. Ware stated that the sequence in which Pardue gave Platt another power of attorney immediately after revoking his prior power of attorney demonstrated that Pardue would sign a document if asked by Platt. Dr. Ware did not believe that a lucid interval, in which a person who has shown confusion seems more alert and aware, would have allowed a person with Pardue's level of dementia in May 2002 to understand the meaning of the will she signed. Dr. Ware opined that because of her dementia on May 30, 2002, Pardue did not generally understand the consequences of signing the will and that more likely than not Pardue was influenced to sign that will by Platt.
Sabrina Henderson and John Simms testified that they worked in the building where attorney Hayes' office was located and that he asked them to serve as witnesses for Pardue's will in May 2002. Henderson stated that Pardue was dressed neatly and said that she had taught Hayes at Byrd High School. Henderson testified that she was amazed at how well Pardue was getting around and speaking for a woman who was 101 years old. Henderson stated that Hayes asked Pardue to read the will and that Pardue looked at the will and signed. Simms testified that when Hayes gave Pardue the will she "glanced" at it and Simms did not know if she actually read the will. Henderson and Simms testified that Pardue seemed to understand what she was doing and that they were in the room with *424 Pardue for approximately five to ten minutes.
Dr. George Seiden, who was accepted as an expert in general and forensic psychiatry, testified that Dr. Paul, who examined Pardue at Willis-Knighton in August 2002, reported that he had discussed with Pardue the need for her to move to a nursing home and that Dr. Paul believed she had understood what he was saying to her. Dr. Seiden stated that the records of Pardue's September 2002 hospitalization showed that numerous medical staff interacted with Pardue and indicated she was able to understand and respond to them. Dr. Seiden testified that although Thigpen may have viewed Pardue through "rose-colored glasses" because of his affection for her, with regard to his area of competence, financial decision-making, Thigpen stated that Pardue understood her financial situation. Dr. Seiden found the testimony of Robert Booth, a notary public and realtor, significant because at a time before the May 2002 will, Pardue told him the language she wanted included in an affidavit. Dr. Seiden pointed out that later, after the 2002 will had been signed, Pardue called Booth about an appraisal of her home, indicating that she knew her house was an asset with value.
Dr. Seiden testified that one cannot conclude that because Pardue did not function well on some days she was at a moderately severe stage of dementia and that although there were periodic instances of agnosia, as when Pardue could not recognize that a hairbrush was not a key, the more pervasive picture shown by the record was that on most occasions she did not demonstrate agnosia or difficulty in wearing proper attire. Dr. Seiden stated that testamentary capacity is a function-specific assessment, meaning that the fact that Pardue could not dress properly or remember certain events or information did not mean she was unable to understand the act of creating a will because those are totally different functions. Dr. Seiden opined with reasonable medical certainty that on May 30, 2002, Pardue was able to understand the nature and consequences of the will she signed. In addition, Dr. Seiden testified there was no evidence that Pardue was subject to undue influence by Platt in creating the will because Hayes said that he raised the issue of a will with Pardue and she otherwise would not have made a will. Dr. Seiden opined with reasonable medical certainty that the record did not show that Platt exercised undue influence over Pardue.
Platt's primary argument is that FBC and Herndon failed to prove Pardue lacked testamentary capacity when the May 2002 will was executed because the witnesses who observed Pardue sign the will on that date testified that she seemed to understand the import of her act. However, the testimony demonstrated that the ability of those witnesses to assess Pardue's capacity was quite limited since they had never met Pardue before and they were with her for only ten minutes. The trial court weighed the perceptions of those witnesses against the testimony of individuals who had known Pardue for many years and who described Pardue's declining mental capacity. These long-time friends presented a portrait of a woman who, during the period leading up to May 2002, failed to recognize her sister-in-law, could not explain the reason why she signed checks amounting to thousands of dollars, attempted to use a deposit slip as a check to pay sorority dues and who demonstrated increasing difficulty in performing such daily activities as choosing the proper clothing, grooming herself and cooking meals.
Platt's expert witness, Dr. Seiden, opined that when she signed the May 2002 *425 will, Pardue's memory deficit was so severe that she did not remember her living relatives or that she had previously signed a will in 1989. Additionally, Pardue's act of giving Platt another power of attorney only days after she signed a revocation of Platt's May 2002 power of attorney demonstrates that Pardue was unable to comprehend the meaning and consequences of the legal documents she was signing.
The trial court heard the testimony and weighed the credibility of the witnesses. The court was presented with competing interpretations of the evidence and made a decision based upon extensive findings of fact. After reviewing the entire record, we cannot say the trial court was clearly wrong in finding clear and convincing evidence that Jo Green Pardue lacked testamentary capacity when she signed the May 2002 will. The assignment of error lacks merit. Although in reaching this conclusion we need not discuss undue influence, in the interest of judicial economy we will address the parties' arguments on this issue recognizing the possibility of future review in the courts.

Undue Influence
Platt contends the trial court erred in finding that the May 2002 will was a product of undue influence. Platt argues that FBC and Herndon failed to prove undue influence because they could not show specific evidence that Platt substituted his volition for that of Pardue.
A donation mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the donor's volition as to substitute the volition of the donee or other person for that of the donor. LSA-C.C. art. 1479. Mere advice, persuasion or kindness and assistance should not constitute influence that would destroy the free agency of a donor and substitute another's volition for his own. Article 1479, Revision Comment (b); Succession of Miller, 35,244 (La.App. 2d Cir.12/7/01), 803 So.2d 1021, writ denied, 02-0559 (La.4/26/02), 814 So.2d 560.
Generally, a person who challenges a donation because of undue influence must prove it by clear and convincing evidence. LSA-C.C. art. 1483. The district court's finding of whether there was undue influence is fact intensive and cannot be disturbed on appeal in the absence of manifest error. Succession of Miller, supra.
In the present case, the trial court found that Pardue's moderate to severe dementia in May 2002 made her particularly susceptible to undue influence by Platt, who was diagnosed as having a possible anti-social personality disorder by Dr. Seiden. The court also found that Platt's disposition to take advantage of senior citizens was shown by evidence that Platt seized upon Pardue's fear of being placed in a nursing home to influence her to grant him a power of attorney. The record shows that the power of attorney was Platt's desire, because after learning that his May 2002 power of attorney had been revoked, Platt contacted attorney Hayes, drove Pardue back to Hayes' office and remained in the room while Pardue signed another power of attorney to Platt. In addition, the court was troubled that many checks were paid to Platt for work supposedly done at Pardue's home that he admittedly did not perform. Platt testified that he paid others to do the work, but he could not specifically identify those workers and he did not provide any receipts to corroborate that such work was actually done. The numerous checks made payable to Platt, who had written in his own name as payee, support a finding that he was exerting his will regarding Pardue's finances. Furthermore, Platt was often alone with Pardue and so had *426 the opportunity to exert undue influence and the resulting donation did not benefit the more natural objects of Pardue's bounty.
Based upon this record, we cannot say the trial court was clearly wrong in finding clear and convincing evidence that the May 30, 2002 will was the product of undue influence by Platt resulting in the substitution of his volition for that of Pardue. The assignment of error lacks merit. In affirming the judgment, we need not discuss the summary judgment issue.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed to the appellant, Charles Larry Platt.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, MOORE, and LOLLEY, JJ.
Rehearing denied.