892 So.2d 790 (2005)
Bertha B. NELSON, Plaintiff-Appellee,
v.
SOUTHEAST FOOD, INC., d/b/a County Market, Defendant-Appellant.
No. 39,157-CA.
Court of Appeal of Louisiana, Second Circuit.
January 28, 2005.
Rehearing Denied February 24, 2005.
*791 Scott L. Zimmer, Shreveport, for Appellant.
C. Bryan Racer, Monroe, for Appellee.
Before WILLIAMS, DREW and LOLLEY, JJ.
WILLIAMS, J.
Southeast Food, Inc. d/b/a County Market ("County Market") appeals from a judgment holding it liable for personal injuries to the plaintiff, Bertha Nelson, and awarding her $8,982.19 in general and special damages and lost wages. We affirm.

FACTS
On the evening of July 8, 2002, Ms. Bertha Nelson, a housekeeper, went shopping at the County Market grocery store in Monroe, Louisiana. She intended to *792 purchase calamine lotion and chicken wings; because she was only planning to buy two items, she said that she did not get a grocery cart. She first retrieved the calamine lotion and then she walked toward the "cold" section of the store to get the chicken.
Due to some confusion and alleged inconsistencies in the testimony, the layout of this section of the store and the site of the events that led to this lawsuit were explored in depth during discovery and at trial. A tall vertical refrigerated display case runs all along one wall of the store except for a break for a door that opens to a private area of the store. In this refrigerated case, the store displays various dairy items for sale. The store's floor covering in this area is a hard, white linoleum-type material. There is a small circular drain in the floor immediately adjacent to the dairy case situated approximately at the horizontal center of the case. Across the aisle (which is approximately three grocery cart-widths wide) from the wall-length dairy case are several low rectangular freezer cases for displaying meats. These cases are separated at several intervals by spaces that allow shoppers and their carts to pass through the meat displays to and from the dairy case to the next adjacent aisle which contains a long unbroken vertical freezer case that runs parallel to the meat cases. At the end of the dairy case at the rear of the store is a perpendicular wall; where the dairy case meets this wall, there is another door to a private area of the store. Along the perpendicular wall there is another display case. There is a long aisle running along the back of the store between the rearmost meat freezer and this perpendicular display case.
On two occasions earlier in July 2002, the store had a plumber working to clear and unclog the store's drains; a receipt from July 6, 2002, reflects that the plumber "rodded drains in meat cooler-cleared blockage." The store manager, Gary Lavel, confirmed that the plumber had been in the store on July 6.
The assistant manager of the store, Chad Creel, testified that the floor log from 7:45 on the evening of July 8, 2002, showed that "there was no water on the floor" at that time. However, at some point that evening, water began coming up out of the floor drain near the dairy case. Eventually this water created an oval-shaped puddle about eight to ten feet long and about three feet wide adjacent to the dairy case.
Ms. Nelson testified that as she was shopping in the area of the meat displays, she slipped and fell. Despite ample testimony on the issue, the precise location of her fall is unclear from this record because much of her most relevant testimony was illustrated by gestures and demonstrations that are not adequately conveyed by the record.
After the incident, Ms. Nelson wrote on the store's accident report in the "location" blank that the accident happened in "dairy in front of butter." At her deposition, Ms. Nelson said that after she got the calamine lotion, she walked back to where the cash registers were, turned right, and had just begun to make another right turn to go to the meat section when she slipped and fell in water. She later testified as follows:
Q: So the aisle that you fell at or where you fell at, on one side of the aisle is butter and dairy products?
A: Uh-huh (yes).
Q: And on the 
A: You could see that. Uh-huh (yes). That's where the  where the  where *793 the  When I got up, that's when I started looking around.
...
Q: So one side of the aisle is butter and dairy products?
A: Uh-huh (yes)....
Q: And on the other side of the aisle are meat products?
A: Yes, sir....
Q: Okay. Just to clarify so I can get a better idea of where you were, you were walking down an aisle. At the end of that aisle is the meat department aisle.
A: Yes, sir.
Q: On the far side of the meat department aisle away from you would have been the butter and dairy products?
A: Yes, sir.
Q: Closer to you would have been the part of the meat department aisle that had the meat?
A: Yes, sir.
Q: You were trying to take a right turn 
A: Yes, sir.
Q:  just before you slipped and fell to go to the meat 
A: Yes, sir.
At trial, she explained:
Q: And the question in your deposition was you were in an aisle on one side of that aisle was butter and on the other side of the aisle was meat and that's where you said you fell, correct?
A: No, I said I fell between the meat bins.[1] I hadn't  I wasn't nowhere at the butter when I fell. I wasn't nowhere over there in that area. I only fell one place. Now, after I got up I'm faced with what's over there.
Ms. Nelson also pointed at the scene on the videotape. The trial judge noted that she was familiar with the layout of the store.
Ms. Nelson said that when she fell, she told a woman who had her back turned to her that she had fallen and that this person said "Baby, I should have told you it was water on the floor." Ms. Nelson said that she had not previously seen the water on the floor and said that the water "was gushing out of there. It was just everywhere." Ms. Nelson said that she then got a nearby cart, put her lotion in the cart and then continued shopping in the meat section for the chicken wings. She said that she began to have pain in her right knee as she shopped and that her knee began to swell. She testified that after she finished her shopping, she reported the incident to the manager, a "Mrs. Clara," and that another employee took pictures of her and her right knee.
The location of Ms. Nelson's fall remains uncertain despite more than an hour of store surveillance videotape admitted into evidence. The County Market had a sophisticated time-lapse video surveillance system in place that used sixteen cameras to cover various parts of the store. One of the cameras was placed above the doorway at the intersection of the dairy display case and the back wall. The camera gives a lengthwise view of the dairy/meat aisle; the video clearly shows the entire length of this aisle and the area of the floor drain from which the water backed up.
The first segment of the videotape introduced into evidence is from the above-described camera and shows a color view of the entire area around the puddle for a 43-minute period, labeled as 2029 (8:29 *794 p.m.) through 2112 hours (9:12 p.m.)[2] on the tape. Ms. Nelson appears on the tape for three minutes (between 2045 to 2048 hours); in that period she is shown pushing a cart and, at one point, bending over to pick up something that she dropped. She was initially confused and did not believe that the subject on the tape was her, but ultimately she admitted that she was the person depicted on the tape. Ms. Nelson is not shown falling at any point on this video. She also is not shown walking through the water during this period, although she approaches and avoids the puddle at one point. Several other customers are shown either avoiding or walking through the puddle. The puddle noticeably grows in size during this period.
At about 2053 hours, Mr. Creel appears on the tape taking pictures of the puddle and preparing to clean up the water. The pictures he took  of the puddle surrounding the drain  are included in the record, but Ms. Nelson said that they do not depict where she fell. There are no still pictures of the aisles between the meat cases.
The second segment of the tape runs from 2047 to 2048 hours and is taken from a black and white camera mounted over what appears to be the meat display case that is fourth farthest from the rear wall perpendicular to the dairy aisle. The camera is aimed toward that rear wall and shows the area where, as best as can be determined, Ms. Nelson said that she fell. This segment shows Ms. Nelson pushing her cart around this area and shopping at the meat display cases. Ms. Nelson was confused by this section of the video and described the scene as "a puzzle." Ms. Nelson is not shown falling on this segment of tape.
The next two segments of the videotape are taken from two other cameras in nearby areas but not in the area where Ms. Nelson said that she fell. They show Ms. Nelson pushing her cart through the soft drink aisle toward what appears to be the front of the store; again, there is no evidence of a fall. The last brief segments are enlargements of the earlier sections of the tape including an enlargement of the incident at 2047/2048 where Ms. Nelson drops some food onto the floor and picks it up and an enlargement that shows Ms. Nelson's face as she is shopping at the meat counter.
Mr. Creel explained that the special time lapse video must be descrambled before it can be viewed and that he did not descramble the earlier segments of tape to see how long the water had been on the floor. The store's accident report lists the time of the accident as 8:40 p.m. Ms. Nelson filled out part of the report and Mr. Creel filled out part of the report; at trial, Ms. Nelson indicated with a gesture those parts of the report that she wrote. It is not clear from the record, which reflects Ms. Nelson's testimony alone, whether she admitted to writing 8:40 as the time of the accident. Mr. Creel testified that Ms. Nelson wrote in the time.
With reference to the location of the photographs that include the dairy section, but not the meat bins, Mr. Creel testified that Ms. Nelson did not show him where she fell but explained the location with specificity. Although Ms. Nelson said that the back of her legs, her rear and her shirt were wet from water from the floor, Mr. Creel said that Ms. Nelson was not wet and was not visibly injured. Photos of Ms. Nelson do not clearly show whether her clothes are wet or not. Mr. Creel said that she had about ten items in her shopping *795 cart, whereas Ms. Nelson asserted that she only bought lotion and chicken.
The day after the incident, Ms. Nelson went to the emergency room of St. Francis Medical Center in Monroe. She complained of right leg pain and lower back pain. The emergency room doctor ordered an x-ray of her knee and put Ms. Nelson in a knee immobilizer. The x-ray revealed only mild osteoarthritis; no fracture was seen. The doctor prescribed Daypro, an anti-inflammatory, and Flextra, a muscle relaxer, and restricted Ms. Nelson from working for two days. His instructions to Ms. Nelson included directions for her not to stand for prolonged periods, to apply moist heat for her knee as needed and to see a chiropractor if her pain did not improve. Her emergency room bill was $421.05.
Ms. Nelson said that her pain did not improve with the prescribed conservative therapy so she commenced seeing a chiropractor, Gregory Mayfield, D.C., on September 6, 2002. She complained of right knee pain, upper and lower back pain, neck pain and headaches. The chiropractor's examination revealed that Ms. Nelson had a limited range of motion, with pain, in various areas. She underwent chiropractic treatment 23 times from September 6, 2002, through November 7, 2002. She reported no symptoms of pain at any visit from October 15, 2002, to the end of her treatment although the chiropractor continued to note tenderness and limited ranges of motion in Ms. Nelson's back throughout treatment. At her last visit, Ms. Nelson reported that her symptoms had completely resolved, and the chiropractor noted that Ms. Nelson's prognosis was good. He gave her a release to return to work the next day. Ms. Nelson incurred a $1,965.00 bill with the chiropractor.
Ms. Nelson said that the injury caused her to miss between 25 and 30 days of work as a housekeeper for her clients. She said that for one client she missed 15 days of work where she would have made $40.00 per day and she missed about 2 weeks of work for another client where she was paid $8 per hour for 30 to 40 hours per week. She also said that she continues to suffer pain in her knee and that this slows her in her activities because she does not own a car and must walk many places.
After hearing the testimony and accepting the deposition and medical records into evidence at the January 26, 2004, bench trial, the trial court took the case under advisement. On April 14, 2004, the court signed a judgment finding that Ms. Nelson was injured in a fall at County Market and awarding Ms. Nelson $5,750.50 in general damages, $2,632.19 in special damages and $600.00 in lost wages. The court did not supply written reasons for judgment and none were requested. County Market now suspensively appeals.

DISCUSSION
County Market assigns five errors:
1. The trial court committed reversible error when it found that plaintiff slipped and fell in defendant's store.
2. The trial court committed reversible error when it found that plaintiff met her burden of proving the requisite notice under LSA-R.S. 9:2800.6(B)(2).
3. The trial court committed reversible error when it found that defendant failed to exercise reasonable care as is required by LSA-R.S. 9:2800.6(B)(3).
4. The trial court's general damage award was excessive and constituted an abuse of discretion.
5. The trial court committed reversible error when it awarded damages for lost wages.

*796 Liability of County Market

We consider the first three assignments of error together. LSA-R.S. 9:2800.6 provides, in part:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.
C. Definitions:
(1) "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.
A court of appeal should not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State Dept. of Transp. & Development, 617 So.2d 880 (La.1993). The task of a reviewing court is to assess whether the fact finder's resolution of a factual issue was reasonable in light of the record as a whole. Fowler v. Wal-Mart Stores, Inc., 30,843 (La.App.2d Cir.8/19/98), 716 So.2d 511.
County Market first argues that Ms. Nelson failed to prove that she fell at the store. Elements of the evidence tend to support that argument. Perhaps most significantly, Ms. Nelson is not shown falling on any of the extensive surveillance video evidence. Clearly she did not fall in front of the butter section of the dairy aisle between 8:29 and 9:12 (assuming those times to be roughly accurate) because all of the videotape from that period showing the puddle was introduced into evidence. Ms. Nelson explained at one point in her deposition that this was the location of her fall and additionally she indicated on the store's accident report that she fell in "dairy in front of butter," the location of the clogged drain and the puddle.
Despite these contradictions, however, it is not apparent that the trial court's judgment was unreasonable or manifestly erroneous given the record as a whole. We have carefully scrutinized both the deposition and the trial testimony of Ms. Nelson. From that review we observe that Ms. Nelson's explanations of the incident are not so much inconsistent as they are imprecise or inarticulate. The attorneys for both parties, and ultimately the court, engaged *797 Ms. Nelson in a lengthy examination at trial to clarify the location of her fall, but she was simply unable to articulate her position at the time of her fall. A witness' inarticulate response to questioning does not, in and of itself, equate to disingenuousness. The record reflects that Ms. Nelson ultimately gestured and pointed to locations on the videotape in an effort to make herself understood, and the court seemingly accepted this manner of explanation. On appeal with only the written record of the trial testimony, this court defers to the trial judge's superior ability to observe the witness and her demeanor not only with regard to her credibility but also with regard to the whole import of her testimony including her gestures.
Ms. Nelson indicated, and the trial court evidently accepted, that Ms. Nelson's fall occurred between the meat bins in a portion of the store not captured on the longest portion of the store's surveillance video. The portions of the surveillance video introduced into evidence that showed this area commenced at a time when Ms. Nelson's fall may already have occurred and showed her only shopping with a buggy, something that Ms. Nelson said she used only after her fall. Ms. Nelson's progress through the store and into the meat section from the time of her entrance into the store is likewise not shown on the tape. Ms. Nelson and Mr. Creel differed on whether Ms. Nelson's clothes were wet after the fall; evidently the court accepted Ms. Nelson's testimony. Although this court might have weighed the evidence differently if it were the trier of fact, the appellant has not shown on this peculiar record that the trial court was manifestly erroneous in accepting Ms. Nelson's testimony and finding that she fell.
In addition to proving that she fell, Ms. Nelson had to satisfy the elements of LSA-R.S. 9:2800.6. A plaintiff must prove all three elements of Section B in order to prevail. White v. Wal-Mart Stores, Inc., 97-0393 (La.9/9/97), 699 So.2d 1081; Allen v. Wal-Mart Stores, Inc., 37,352 (La.App.2d Cir.6/25/03), 850 So.2d 895. County Market alleges that Ms. Nelson failed to prove that the merchant had actual or constructive notice of the puddle resulting from the backed-up drain. Ms. Nelson did not allege that the supermarket had actual notice; she relied on constructive notice. To prove constructive notice, the claimant must show that the substance remained on the floor for such a period of time that the defendant would have discovered it by the exercise of ordinary care. White, supra. LSA-R.S. 9:2800.6 does not allow for the inference of constructive notice absent some showing of this temporal element. Allen, supra. Whether the period of time is sufficiently lengthy that a merchant should have discovered the condition is necessarily a fact question; however, there remains the prerequisite showing of some time period. Allen, supra. A claimant who simply shows that the condition existed without an additional showing that the condition existed for some time before the fall has not carried the burden of proving constructive notice as mandated by the statute. Allen, supra.
In the present case we have a surveillance videotape showing that the puddle was on the floor for at least 24 minutes before a store employee came to the area. The puddle was present on the floor at the beginning of the tape and grew in size over the passage of time on the tape. At the indicated video commencement time of 8:29, the puddle was already of a noticeable size and customers are shown on the tape avoiding the water. The source of the puddle was the backing up of the floor drain, and, although we see no sign that the water was "gushing" out of the floor as described by the plaintiff, the rate of spread of the water is visible on the surveillance *798 tape. Further, the spill was in close proximity to a private area of the store where employees would be expected to notice it in the ordinary course of business. Given the actual visual evidence in the record of the presence and growth of the spill over the passage of time, we cannot say that the trial court was manifestly erroneous in finding that the store had constructive notice of the spill.
County Market also urges that Ms. Nelson failed to prove that the store did not exercise reasonable care. In Jones v. Brookshire Grocery Co., 37,117 (La.App.2d Cir.5/14/03), 847 So.2d 43, this court discussed this standard:
Merchants are required to exercise reasonable care to protect those who enter the store, keep the premises safe from unreasonable risks of harm and warn persons of known dangers. Although the owner of a commercial establishment has an affirmative duty to keep the premises in a safe condition, he is not the insurer of the safety of his patrons. A store owner is not liable every time an accident happens.
The merchant's duty of care requires that reasonable protective measures, including periodic inspections, are undertaken to ensure that the premises are kept free from substances or conditions that might cause a customer to fall. Whether measures taken are reasonable must be determined in light of the circumstances of each case. As noted by the court in Stockwell v. Great Atlantic & Pacific Tea Co., 583 So.2d 1186 (La.App. 1st Cir.1991) (citations omitted), the degree of vigilance must be commensurate with the risk involved, as determined by the overall volume of business, the time of day, the section of the store and other relevant considerations.
(Citations omitted).
The record reflects that the store had plumbing problems in this area of the store shortly before this incident and that the store had retained a plumber to rectify the problem. Given the closeness in time of the plumber's visit and the absence of evidence that the backup had reoccurred from that visit until this incident, there was little evidence that the store should have expected a puddle to appear around this drain. Nevertheless, the size of the puddle in this case was so substantial that it posed a significant risk to patrons by providing a source of water that could be spread by tracking to other areas of the store. The videotape likewise shows that this was a busy area of the store even at 8:30 p.m., and an accumulation of water in this area was more likely to be spread than a similar accumulation in a more quiet area. Although this is a close issue, again, we find no manifest error.

Damages
County Market argues that the trial court's award of $5,750.50 in general damages to Ms. Nelson was excessive. In Simms v. Progressive Insurance Company, 38,804 (La.App.2d Cir.9/29/04), 883 So.2d 473, this court explained:
General damages are those that may not be fixed with pecuniary exactitude. Mental and physical pain and suffering, inconvenience, loss of physical enjoyment, and other losses of lifestyle are damages that are not subject to exact measurement in monetary terms.
Because the trier of fact is given great and even vast discretion in setting general damage awards, an appellate court should rarely disturb an award of general damages. The initial inquiry in appellate review of general damages is "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the *799 `much discretion' of the trier of fact." Thus, to determine whether the trier of fact abused its discretion in awarding damages, we must look first to the individual circumstances of the case.
Only when the award is in either direction beyond that which a reasonable trier of fact could have assessed for the effects of the particular injury on the particular plaintiff under the particular circumstances should the appellate court reduce or increase the award. The award may then be raised or lowered only to the highest or lowest point reasonably within the discretion of the trier of fact. An appellate court should view the evidence in the light most favorable to the plaintiff in deciding whether an award is excessive. If an articulated factual analysis shows an abuse of discretion by the trier of fact, then the appellate court may look to prior awards to determine the highest or lowest point within the trier of fact's discretion.
In this case, Ms. Nelson explained that her knee injury impacted her life more substantially than it might have affected another person because she did not own a car and walked most of the places she went. She said that she had to slow her otherwise active life to accommodate her pain. Although Ms. Nelson's injury was not severe, the trial court evidently accepted that the injury had a disproportionate effect on Ms. Nelson because she had no automobile. Given these facts, we find no abuse of the trial court's great discretion in this award.
Finally, County Market argues that the trial court should not have awarded Ms. Nelson lost wages because her testimony was insufficient to prove her claim. We disagree; a plaintiff's testimony alone may be sufficient, if accepted by the trial court, to prove lost wages. Bruce v. State Farm Insurance Co., 37,704 (La.App.2d Cir.10/29/03), 859 So.2d 296. We detect no manifest error in this award.

CONCLUSION
Accordingly, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, PEATROSS, DREW, and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] This is transcribed as "meat bend," but it appears that Ms. Nelson was probably saying "meat bin" or "meat bins."
[2] Mr. Creel explained that the time is "not necessarily exactly correct" on the video. He said that the tape "looks seven... it looks ten minutes fast or so."