973 So.2d 831 (2007)
Joseph Brandon LOCKE, Plaintiff-Appellee,
v.
Lonnie Dale YOUNG, Jr., et al., Defendants-Appellants.
No. 42,703-CA.
Court of Appeal of Louisiana, Second Circuit.
December 12, 2007.
*835 Jeansonne & Remondet, by Michael J. Remondet, Jr., Lisa C. McCowen, Lafayette, for Appellant, RPM Pizza, LLC, d/b/a Domino's Pizza.
Phelps Dunbar, LLP, by H. Alston Johnson, III, Baton Rouge, Powers, Sellers, Mixon & Chapoton, by Douglas M. Chapoton, Sam N. Gregorio, Roy S. Payne, Shreveport, for Appellee, Joseph Brandon Locke.
Before GASKINS, PEATROSS, and DREW, JJ.
GASKINS, J.
In this tort case, the trial court awarded judgment in favor of the plaintiff, Joseph Brandon Locke, who was seriously injured when his motorcycle collided with a car driven by a pizza deliveryman. The defendant pizza company appeals, contending that the trial court erred in assessing no fault to the plaintiff. The defendant also complains that the awards of $1,100,000 in future lost wages and lost earning capacity and $1,950,000 in general damages are excessive. The plaintiff answered the appeal, asserting that the awards for future medical expenses and for future lost wages and lost earning capacity were inadequate. We amend the trial court judgment and, as amended, affirm.

FACTS
At about 9:00 p.m. on February 20, 2004, Joseph Locke, a 22-year-old LSUS senior, was riding his motorcycle north on Pines Road in Caddo Parish. Lonnie Young, a 20-year-old Domino's Pizza deliveryman, was going south when he turned left into a parking lot. As a result of this maneuver, the motorcycle and the car collided. Locke was seriously injured; as a result, he has no memory of the accident.
Locke filed suit in April 2004. Initially named as defendants were Young; his insurer, Illinois National Insurance. Company; and his employer, RPM Pizza, LLC, d/b/a Domino's Pizza. Added later were New Hampshire Insurance Company and Clarendon America Insurance Company, who were alleged to be RPM Pizza's liability carriers.
*836 Prior to trial, Illinois National Insurance Company settled and was dismissed; its insured was dismissed insofar as his personal exposure was concerned. The plaintiff reserved his rights against the remaining defendants. New Hampshire Insurance Company and Clarendon America Insurance Company likewise settled and were dismissed, leaving RPM Pizza as the remaining defendant. The various settlements amounted to slightly more than $1.5 million.
The trial court granted a pretrial Daubert[1] motion by the plaintiff to exclude the testimony of expert witness Stephen Killingsworth who had been retained by Clarendon America Insurance Company. In so doing, the court found fault with Killingsworth's methodology in concluding that the speed of the motorcycle was a factor in the accident. This court denied writs on the basis that exercise of its supervisory jurisdiction was not warranted; the Louisiana Supreme Court also denied writs.
A bench trial was held in October 2006. At the conclusion of trial, the trial judge gave oral reasons for judgment. The court found that the accident occurred due to the sole fault of Young in making an improper left turn. However, it found no fault by Domino's on the claim of negligent hiring or training.
The trial court awarded a total of $3,835,352 in damages to the plaintiff. The defendant was deemed entitled to a credit of $1,520,000 for the amounts given in settlement by the insurers and the credit provided under La. R.S. 32:866(A) due to the plaintiff's lack of mandatory insurance coverage. Judgment was signed October 31, 2006. In December 2006, RPM Pizza filed a suspensive appeal.
In March 2007, a judgment for costs and expert witness fees was signed, reflecting the sum of $60,000. The defendant filed a devolutive appeal as to this judgment to preserve its right to object should the main judgment be reversed or modified.[2]

DAUBERT HEARING
The defendant argues that the trial court should not have excluded the testimony of Stephen Killingsworth, an accident reconstructionist. It contends that since the plaintiff is unable to recall the accident itself and the accident occurred in the plaintiff's lane of travel, this defense witness' testimony was especially important. The defense wished to use Killingsworth's testimony to establish its theory that a vehicle between Young's car and the motorcycle blocked Young's view of the motorcycle and that the plaintiff was speeding.
In his brief, the plaintiff claims that the trial court correctly excluded Killingsworth's testimony due to his faulty methodology and unsupported assumption of the motorcycle's position when Young began his left-hand turn. However, he notes that, since a jury trial was waived and the judge who heard the motion in limine was also the trial judge, the trier of fact in the instant case had the benefit of hearing Killingsworth's testimony and found it baseless.

Law
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine *837 a fact in issue, a witness qualified as an expert by knowledge, skill or experience may testify thereto in the form of an opinion. La. C.E. art. 702. The admission of expert testimony is proper when the following three factors are established: (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert, and (3) the testimony assists the trier of fact through the application of scientific, technical or specialized expertise. Cheairs v. State ex rel. Department of Transp. and Development, XXXX-XXXX (La.12/3/03), 861 So.2d 536.
In Daubert, the court established factors for evaluating the methodology employed by expert witnesses, including the "testability" of the scientific theory or technique, whether the technique has been subjected to peer review and publication, the known or potential rate of error, and whether the methodology is generally accepted in the scientific community. A district court is accorded broad discretion in determining whether expert testimony is admissible and who should be permitted to testify as an expert. Cheairs, supra; In re Succession of Pardue, 40,177 (La. App.2d Cir.11/8/05), 915 So.2d 415, writ denied, XXXX-XXXX (La.4/28/06), 927 So.2d 284.
The Daubert factors are designed to "assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue." Cheairs, supra.

Discussion
In his report, Killingsworth opined that Locke was traveling, a minimum of 56 to 58 mph before the collision. (The record indicates that the posted speed limit was 40 mph.) However, the report does not contain a single calculation or any recorded measurements of time or distance.[3] Killingsworth subsequently testified that he relied upon Young's deposition and the police report. Killingsworth also met Young at the accident scene more than two years after the accident and had Young do a "turning exercise" in which he made the same left-hand turn multiple times. According to Young, there was a car trying to exit at the parking lot entrance he intended to use; as a result, he chose to turn in at a closer entrance where the accident occurred.
Killingsworth assumed that the motorcycle was about 150 feet from the point of impact and the turn took 1.75 seconds, for a motorcycle speed of 85 feet per second or 58 mph.[4] The measurement of 150 feet was not based on physical evidence, but upon Young's statement that a car at an entrance farther down the road exited the lot and turned. Killingsworth also assumed that the exiting car Young claimed to have seen turned at the same time that Young did. He further applied an assumption that, since Young said he did not see the motorcycle, the motorcycle was not there to be seen. He asserted that it was not reasonable to think that Locke was *838 closer than 150 feet from the point of impact when Young started to turn because Young said he didn't see him. However, he conceded under questioning by the trial judge that the motorcyclist was there to be seen by Young immediately before the collision, but was not seen.
Rahn Huffstutler, a licensed professional engineer who was accepted as an expert in accident reconstruction and metallurgical engineering for purposes of the Daubert hearing, testified that Killingsworth's methodology was questionable. The equation of distance divided by time equals speed; according to Huffstutler, they have neither the time nor the distance to plug in the equation and it is unscientific to assume a value for two of the variables in order to give an opinion on the results. Because it is simple division, Huffstutler testified that Killingsworth's approach brought no science to bear on the analysis. He further testified that this approach is not a generally accepted practice among accident reconstruction experts. Nor is it a testable, reproducible approach or peerreviewed. Huffstutler observed that there was no way to scientifically corroborate Young's testimony that he did not see the motorcycle.
Rod Scobee, the supervisor for accident reconstruction for Troop G of the Louisiana State Police, was hired by the plaintiff. He testified that, in the high speed crashes he routinely investigates, the damage to the vehicles and the distances from the point of impact to the final resting point of the motorcycle and its driver are usually much greater than the ones found in the present case. When he visited the accident site and reviewed the photos and measurements, he found nothing suggestive of the motorcycle exceeding the speed limit.
Corporal William Vincent, a Shreveport Police Department crash investigator, testified that he was called to the accident scene shortly after the collision. He painted the markings on the road that indicated where the skid marks started and stopped, and he was present when the police photos were taken. Relying upon the physical evidence, he determined that high speed was not involved.
At the conclusion of the hearing, the trial court granted the plaintiff's motion insofar as it dealt with Killingsworth's rate, time and distance calculations. According to the court, Killingsworth's analysis was not scientific inquiry but the application of arithmetic: "It's arithmetic to assumptions and the Court is not comfortable with those assumptions." The court also found that Killingsworth applied a flawed major premise that Locke's motorcycle could not be seen because Young failed to see it. The court did not believe that there was sufficient foundation for the assumption of the amount of time it took Young to make his left-hand turn.
The trial court's decision to grant the plaintiff's Daubert motion was based upon its conclusion that the methodology underlying Killingsworth's testimony was not scientifically valid on the issue of his rate, time and distance calculations. The trial court has broad discretion in determining admissibility of expert testimony. In light of the testimony presented, especially that of Huffstutler as to the ease with which the calculations could be manipulated, we find no abuse of this discretion.
The defendant's argument that the granting of the motion by the trial court placed it at a disadvantage at trial ignores the fact that the case was tried in a bench trial before the same judge who ruled upon the motion. The trier of fact in the instant case had the full benefit of all of Killingsworth's testimony and opinions and found them lacking in the methodology required under Daubert, supra.

*839 LIABILITY
The defendant contends that, in light of evidence indicating that the plaintiff might have been, speeding, it was inappropriate to assess all liability to its employee; it asserts that the fault should be assessed equally between Young and Locke. The plaintiff asserts that there was no eyewitness testimony that he exceeded the speed limit. Also, the senior accident reconstructionist from the Shreveport Police Department testified that, when he investigated the accident scene, he was looking for evidence of high speed by the motorcycle and found none.

Law
A left turn is one of the most dangerous maneuvers a motorist may execute and, before attempting, a motorist must ascertain whether it can be completed safely. Toston v. Pardon, XXXX-XXXX (La.4/23/04), 874 So.2d 791. In a vehicular collision case, plaintiffs are afforded the benefit of a presumption of the defendant's negligence when they prove that the defendant executed a left-hand turn and crossed the center line at the time of the impact. Miller v. Leonard, 588 So.2d 79 (La.1991); Slagel v. Roberson, 37,791 (La. App.2d Cir.11/18/03), 858 So.2d 1288, writ denied, XXXX-XXXX (La.3/12/04), 869 So.2d 824. The burden rests on the motorist who desires to make a left turn to explain how the accident occurred and to show that he is free from negligence. Silva v. Calk, 30,085 (La.App.2d Cir.12/10/97), 708 So.2d 418; Slagel v. Roberson, supra. Nonetheless, all motorists on Louisiana highways must drive with due regard for the traffic on the highway and have an affirmative duty not to drive faster than is reasonable and prudent under the conditions and potential hazards existing at the time. La. R.S. 32:64(A); Lennard v. State Farm Mutual Automobile Insurance Company, 26,396 (La.App.2d Cir.1/25/95), 649 So.2d 1114. Thus, notwithstanding the presumption of negligence attributed to a left-turning driver, a favored motorist can still be assessed with comparative fault if his substandard conduct contributed to the cause of the accident. Slagel v. Roberson, supra.
A court of appeal should not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State through Dept. of Transp. & Development, 617 So.2d 880 (La.1993). The task of a reviewing court is to assess whether the fact finder's resolution of a factual issue was reasonable in light of the record as a whole. Nelson v. Southeast Food, Inc., 39,157 (La.App.2d Cir.1/28/05), 892 So.2d 790. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.

Discussion
Corporal William Vincent, the most experienced reconstructionist on the Shreveport Police Department, testified that he participated in the investigation of the accident scene. According to him, the collision occurred and the motorcycle's skid marks began in the plaintiffs lane of traffic. The distance between the area of impact and the spot where the motorcycle came to rest was not significant. After reviewing the evidence, he chose not to refer the matter to the district attorney's office; instead, Young received and paid a ticket for failure to yield, and Locke was not cited. Corporal Vincent noted that, to an untrained eye, a motorcycle may appear to be going faster than it actually is due to its size and design.
Kenneth and Reba Cook, an older married couple, testified by deposition that they were stopped at a red light near the accident scene when they saw Locke pass through the same intersection moments *840 before the collision. The police report contains a recitation signed by them and Mrs. Cook's mother that they "[slaw motorcycle cross Buncomb Rd. in front of us at high rate of speed. . . ." According to the Cook couple, that language was the officer's which he wrote down after speaking to them. Mr. Cook testified that he could not say how fast the motorcycle was traveling; he stated, "[I]t seemed to me like he was going, you know, reasonable fast. But when you're sitting stillyou know, I don't know." While acknowledging that she thought the motorcycle was traveling at a high rate of speed, Mrs. Cook conceded that she did not know the motorcycle's speed. Nor could she say it was traveling too fast under the circumstances.
Two Domino's employees, June Haley and Ada Banks, testified that they were at the accident scene and heard a female police officer identified as Corporal Tisha Lensey make a statement that Locke was going to be ticketed for speeding. However, Ms. Banks further testified that Ms. Haley was not at the accident scene when she was there; rather, she talked to her via cellphone and told her what Corporal Lensey said. Ms. Haley testified that she was at the accident scene and that she talked to several people, including Corporal Lensey and Ms. Banks. Corporal Lensey testified that she was stopped at a nearby convenience store writing a report in her car when she learned of the accident from a passerby. She stated that she did not recall making a statement to anyone that she was about to pull Locke over for speeding at the time of the accident.
In its oral reasons for judgment, the trial court assessed 100 percent fault to Young, finding that the sole cause of the accident was his improper left turn. The court concluded that the Cooks were not in a position to say Locke was speeding at the time of the wreck. As to the statement allegedly made by Corporal Lensey, the court noted that she denied making any statement about speeding. It found the officer's credibility unshaken by the testimony of the Domino's employees, which conflicted substantially with each other.
We find no manifest error in the trial court's ruling that Young was solely responsible for the accident. As the trier of fact in this bench trial, the trial judge was in the best position to evaluate the credibility of the witnesses. His resolution of the conflicting evidence was reasonable.

QUANTUM
The trial court awarded damages in the following amounts:

 $ 177,852 for past medical expenses
 $ 500,000 for future medical expenses
 $ 107,500 for past lost wages
 $1,100,000 for future lost wages and earning
 capacity
 $ 500,000 for injuries to his knee
 $ 300,000 for injuries to his ankle
 $ 150,000 for injuries to his hand
 $ 175,000 for injuries to his elbow
 $ 150,000 for brachial plexus injuries and resulting
 atrophy
 $ 150,000 for two bulging discs
 $ 125,000 for cerebral brain dysfunction
 $ 150,000 for scarring and disfigurement
 $ 250,000 for loss of enjoyment of life.
 __________
Total $3,835,352

The defendant does not contest the awards for past medical expenses, future medical expenses, or past lost wages. It complains of as excessive the award of $1.1 million for future lost wages and earning capacity and the general damage awards totaling $1,950,000 for pain and suffering for Locke's various injuries, scarring and disfigurement, and loss of enjoyment of life. The defendant contends that the plaintiff, while grievously hurt, is a highly motivated achiever making a remarkable recovery with the aid of very competent medical care.
The plaintiff appeals as inadequate the awards for future medical expenses and for future lost wages and earning capacity. *841 As to the quantum issues raised by the defendant, the plaintiff recounts the severity of his injuries, which included a traumatic brain injury and the near traumatic amputation of his right leg, and the medical testimony that projects future deterioration of his condition, the necessity of narcotic medications for pain, and the need for additional medical treatment, including multiple surgeries.

Future medical expenses
The plaintiff argues that the award of $500,000 for future medical costs was inadequate and that the court should have awarded $822,105.
The cost of future medical treatment and expenses cannot be precisely measured; however, the plaintiff must still establish future medical expenses with some degree of certainty through medical testimony that such expenses are indicated and their probable cost. Sepulvado v. Turner, 37,912 (La.App.2d Cir.12/10/03), 862 So.2d 457, writ denied, XXXX-XXXX (La.3/19/04), 869 So.2d 855; Lewis v. State Farm Insurance Company, 41,527 (La. App.2d Cir.12/27/06), 946 So.2d 708.
Zoe Meeks, the plaintiffs expert in economics, testified that the plaintiff would be entitled to future medical costs of $838,105 or $822,105 if the court found that the plaintiff would not require a patellectomy and elbow replacement. These computations included a discount rate of five percent and average annual growth rates ranging from 4.6 percent to 9.4 percent, depending upon the types of medical expenses. Dr. Melvin Harju, the defendant's expert economist, testified that the growth rate for medical services used by Ms. Meeks is unsustainable. In its oral reasons for judgment, the trial court stated that it found Dr. Harju's testimony persuasive and noted that the record indicated that the "raw costs" for the plaintiffs future medical expenses would be about $411,000.
In support of his argument, the plaintiff cites Odom v. City of Lake Charles, XXXX-XXXXX (La.App. 3d Cir.1/31/01), 790 So.2d 51, writ denied, XXXX-XXXX (La.6/22/01), 794 So.2d 787, in which the appellate court increased an award for future medical expenses. There the trial court had awarded an amount very close to the present-day value of the future medical expenses as computed by the defendant's expert; he used a lower growth rate than the one used by the plaintiffs expert because he anticipated that the federal government would force the' reduction of medical costs.
In the instant case, the trial court noted that it found convincing Dr. Harju's concerns about the unsustainability of the projected rate of increase of medical services. Nonetheless, anticipating that the medical costs will escalate more than the investment rate, at least for the near future, the trial judge increased the medical costs as submitted by the defendant by $90,000. We find that the trial court did not err in failing to award the amount sought by the plaintiff in view of the trial court's position that the plaintiffs condition was not as dire as his experts contended.

Future lost earnings
As to the award of $1.1 million pertaining to the plaintiff's future earnings, the defendant noted that the trial court did not accept the testimony of the plaintiffs witnesses as to the direness of his future employment. However, the trial court's award was closer to the estimate of $1.5 million provided by the plaintiffs expert, as opposed to the amount of 834,429 suggested by the defendant's expert. The defendant argues that this award should be reduced to "reflect more closely the trial judge's expressed *842 uncertainty about what the amount should be."
In his answer to the appeal, the plaintiff contends that the award of $1.1 million for future lost wages was inadequate; he claims that the court should have awarded $1,435,775.
The discretion of the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Greenhead Gun Club, L.L.C. v. City of Shreveport, 40,045 (La. App.2d Cir.10/12/05), 914 So.2d 62.
A plaintiff bears the burden of proving his claim for lost earnings. For purposes of determining this type of damages, the amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim. Lewis, supra.
Since awards for future lost income are inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty, the courts must exercise sound judicial discretion to determine these awards. Lewis, supra. The awards should be consistent with the record and not work a hardship upon either party. Robbins v. State ex rel. Dept. of Labor, 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991.
The plaintiff presented testimony from his witnesses to the effect that, as a result of his physical injuries, he was currently capable of sedentary and light duty work on a regular basis, but that he would eventually be relegated to sedentary work only. According to his experts, the plaintiff s physical condition will worsen as he grows older, largely due to arthritis in multiple joints, and his work life will be significantly shortened. Due to the closed head injury he sustained in the accident, pessimism was expressed by these witnesses as to Locke's ability to earn an MBA degree which would increase his employment opportunities and enhance his earning ability. The plaintiff maintains that an award of $1,435,775 would be more appropriate than the $1.1 million given by the trial court.
On the other hand, the defendant's experts opined that Locke had essentially suffered little more than a delay in entering the job market and had lost access to some jobs. The defendant contended that the plaintiff can be made whole on this issue by an award of $34,429.
In its oral reasons for judgment, the trial court found that the plaintiff was entering the job market at a competitive disadvantage and with a need for a specialized setting as a result of his injuries. However, the court believed that the plaintiff will be able to work longer than the 19 years projected by his experts, most likely working up to 25 years. The court found that the plaintiff is an achiever who will do very well considering his problems; however, he will need surgeries which will disrupt his employment. Also, his pain will increase over time, making him less competitive.
After a careful review of the evidence, we agree with the trial court's conclusion that Locke's employment future is neither as bleak as his experts predicted nor as rosy as the defendant's experts portrayed. A more valid assessment indicates that Locke has sustained serious injuries which will continue to affect his employment situation for the rest of his life. Not only will he suffer pain and physical restrictions, but he will also have to interrupt his employment periodically to undergo surgeries for various physical maladies which are certain to materialize over time. However, Locke is, by all accounts, a remarkable young man who has made great strides in his recovery due to his own perseverance and discipline. The court relied *843 heavily upon Dr. Paul Ware's opinion that the plaintiff suffered mild cognitive impairment and that he can use adaptive measures to greatly reduce the resulting problems. Dr. Ware also opined that vocationally Locke is limited only by his physical injuries and that he has no significant mental impairment.
We find that the trial court properly applied sound judicial discretion and awarded an amount which is consistent with the record.

General damages
The $1,950,000 award for general damages should be reduced to between $750,000 and $1 million, according to the defendant.
General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty, including pain and suffering. Hunt v. Safeway Insurance Company, 35,306 (La.App.2d Cir.12/5/01), 804 So.2d 724. The discretion vested in the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Hunt, supra.
Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. Hunt, supra. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact. Manuel v. State Farm Mutual Automobile Company, 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
As a result of the accident, Locke suffered several serious injuries to his right side. The most serious injury was a right open knee dislocation; initially, the doctors were not certain if they could save that leg. The attending physician, orthopedic surgeon Dr. Kalia Sadassivan, described the injury as one in which the lower leg and the upper leg were no longer together, with a small skin bridge connecting the thigh to the lower leg. The day after the accident, the doctors performed an open reduction and internal fixation of the right knee with an external fixator which remained in place for more than a month. Two days later, additional surgery, including debridement, was performed. Since then, Locke has had two arthroscopic surgeries, and the evidence indicates that he will require more. The medical witnesses also testified that Locke has extensive scar tissue and severe posttraumatic arthritis which will increase over time. He also has a small limp due to pain and a slight leg length discrepancy. According to Dr. David Waddell, an orthopedic surgeon specializing in reconstructive knee surgery who began treating him in June 2005, Locke will more probably than not require a total knee replacement before age 40. Due to Locke's youth and the fact that a knee replacement will last only about 20 years, Locke will probably require a second total knee replacement. *844 Dr. Austin Gleason, an orthopedic surgeon, and Dr. Howard Katz, a specialist in physical medicine and rehabilitation, concurred. While Dr. Robert Holladay, an orthopedic surgeon who testified for the defendant, agreed that one total knee replacement would be required, he opined that a second one was only a possibility. Locke testified that his kneecap is numb and his range of motion is limited. He experiences pain when he stands, for long periods of time and, due to instability in the knee, he must restrict his activities.
The trial court accepted the testimony that Locke will more probably than not require two total knee replacements. It awarded general damages of $500,000 for the injuries he sustained to his knee. Given the extensive damage caused to the knee, the number of surgeries he has undergone already and will undergo in the years to come, and the substantial pain he has suffered and will continue to suffer due to this injury, we find no abuse of the trial court's discretion.
Locke also sustained a fracture of the anterior distal tibia at the ankle joint. The February 23, 2004, surgical report of the doctors who treated Locke after the accident indicated that they did not think that they could repair the ankle. About a month after the accident, he underwent surgery on his ankle which involved a graft of bone from his hip and the placement of plates and screws; they also performed a capsular release in the back part of his ankle. According to Dr. James Lillich, an orthopedic surgeon specializing in foot and ankle surgery who saw him once in June 2005, Locke has reduced range of motion for inversion and eversion (movements of the sole of the foot inward and outwards) which are most likely permanent. Dr. Lillich recommended arthroscopic debridement surgeries at intervals of five years if the surgery brought good results. Otherwise, he opined that within five to 10 years of the accident, Locke would probably require either an ankle fusion or ankle joint replacement. He believed that Locke was too young to be a candidate for an ankle joint replacement because he would wear it out. A fusion would cause a loss of flexion of the foot at the ankle joint. If a fusion was done, an ankle replacement at a later date would not be possible. Drs. Gleason and Katz concurred with Dr. Lillich's conclusions; however, Dr. Holladay testified for the defendant that he believed that an ankle fusion was only a possibility, not a probability. Locke testified that the pain in his ankle is constant and the ankle is always swollen. As a result of the swelling, he has had to have several surgeries for ingrown toenails.
"The trial court awarded $300,000 for injuries to Locke's ankle, concluding that he will eventually require an ankle fusion surgery. Given the severity of this injury and the medical certainty of future surgical intervention, we find no abuse of the trial court's much discretion.
Locke, who is right-handed, also injured his right hand in the accident. Dr. Marion Milstead, an orthopedic surgeon with a subspecialty in hand and upper extremity surgery, testified about the fracture of Locke's fifth metacarpal, its repair, and the development of significant arthritis in the fifth carpometacarpal (CMC) joint. According to Dr. Milstead, the fracture was repaired with pins; however, the pins were removed, and the bone re-dislocated and healed. (As to Locke's ability to heal, the doctor noted that a patient who has multiple injuries may take longer to heal because of the demands placed on his body.) He concluded that at some point, as the pain worsens, a surgical procedure will be required; he recommended a fusion of the fifth CMC joint within five to 10 *845 years of the accident. Fusion will freeze the fingers in place and prevent Locke from making a cupping movement with his hand. Dr. Milstead also testified that, due to the arthritic pain, Locke will "be on Celebrex for the rest of his life. Drs. Gleason and Katz concurred with Dr. Milstead's recommendation of fusion surgery; Dr. Holladay, however, believed it was not necessary. Locke testified that his right hand aches constantly, and there is pain on the little finger side and between the fourth and fifth fingers. His right-hand grip strength was normal for his age and gender but less than that for his left hand.
The trial court awarded damages of $150,000 for the injuries to Locke's hand. Again, we find no abuse of the trial court's discretion.
Locke suffered a radial head fracture to his right elbow, which healed. Unfortunately, he developed arthritis in the joint due to the damage to the cartilage. According to Dr. Milstead, Locke will more probably than not require a radial head resection within five to 10 years of the accident to reduce his pain. Drs. Gleason and Katz agreed with this conclusion. Additionally, Dr. Milstead opined that Locke will more probably than not need arthroscopic debridement before the resection. He also observed that there is a loose fragment of cartilage in the joint which could increase his arthritis and should be removed. However, Dr. Milstead was unable to say that a total elbow replacement was, more probably than not, required. While Dr. Holladay did not believe that either a total elbow replacement or radial head resection was needed, he suggested that the loose body in the elbow be removed. While at the upper range of the trial court's discretion, we find no abuse in the trial court's award of $175,000 for the injuries to Locke's elbow; the trial court specified that this amount took into consideration the necessity of the radial head resection.
The brachial plexus injuries Locke sustained and the resulting atrophy resulted in an award of $150,000 in general damages. Dr. Milstead testified that this injury to the nerves going into Locke's right shoulder, arm and forearm is permanent. There is no surgical option. While weightlifting might help the shoulder, there would be a risk of injuring the elbow. As a result of this injury, Locke has limitations to his range of motion; while the range of motion in his shoulder will probably remain the same, that in his hand, wrist and elbow will worsen over time. According to Dr. Milstead, he is also at greater risk of dislocating his shoulder due to the lack of muscle stabilization. He has complete atrophy of the deltoid, supraspinatus, and teres muscles; there is a significant cosmetic problem. Dr. Gleason testified that Locke had full range of motion on the right shoulder; however, his right upper mid-arm is about two inches smaller than the left one. While the award of $150,000 appears to be in the upper range for this injury, we are unable to say that the trial court abused its vast discretion.
As to the $150,000 award for two bulging discs, we find that the record contains comparatively little evidence. While his testimony of the issue was somewhat vague, Dr. Gleason indicated that surgery for these discs was a distant probability. Locke testified that he had low back pain daily. Sitting or lying down tended to aggravate it if he stayed in one spot. The record indicates that Locke had no complaints of low back pain before the accident. We find that, on this record, the trial court abused its discretion in this award. We therefore lower it to the highest amount that the trial court could have awarded, or $75,000.
*846 The trial court awarded $125,000 for Locke's cerebral brain dysfunction. Locke recounted having no memory of the accident; he recalled an hour before the accident and then the following night at the hospital. He had to take off a year from college to recover and then went back to finish his degree; however, he stated that he had greater difficulty in school than before. In particular, he had more trouble retaining information and had to study harder. According to Dr. Paul Ware, who is a psychiatrist and neurologist, Locke sustained a closed-head concussion disorder to the brain with mild cognitive impairment, appearing as a short-term recording memory difficulty. According to the testimony of Dr. Mark Vigen, a clinical psychologist who consulted with two other doctors on neuropsychological tests on Locke, he has visual and auditory memory problems; however, he has a positive working memory. While Dr. Vigen felt it was unlikely that Locke could earn an MBA degree now, Dr. Ware believed that he could. The trial court accepted Dr. Ware's testimony as the best analysis of the situationthat Locke has minimal cognitive impairment and can use adaptive measures to greatly reduce the problem. The trial court described the plaintiffs impairment as, not a major hurdle, but a problem that will become a hill he has to traverse daily. We find that the trial court correctly assessed the situation and that its award was not an abuse of its discretion.
As a result of his injuries, Locke has several scars on the right side of his body. In particular, he has severe scarring on his right leg. He also has visible atrophy in his right arm and right leg. His right upper mid-arm was four to five centimeters less in circumference than the left one. His right thigh was at least four centimeters smaller than the left thigh.[5] While Locke stated he was not embarrassed by the scarring, he testified that he was a serious bodybuilder before the accident and that he now dresses to conceal his right arm. While Locke is certainly entitled to an award for his scarring and disfigurement, we find that the trial court's award of $150,000 was excessive. We lower it to the highest award the trial court could have awarded, or $100,000.
The trial court also awarded $250,000 for loss of enjoyment of life. Loss of enjoyment of life, sometimes known as hedonic damages, refers to the detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed. Loss of enjoyment of life is conceptually distinct from other components of general damages, including pain and suffering. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the, injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury. McGee v. A C and S, Inc., XXXX-XXXX (La.7/10/06), 933 So.2d 770.
Locke can no longer pursue bodybuilding or any other strenuous physical activities *847 because of his injuries. For an athletic person, this constitutes a substantial loss of many of the activities and pleasures of life that he previously enjoyed. Due to his youth, this loss of enjoyment will span a majority of his lifetime and result in deprivation or at least curtailment of many activities that he would have ordinarily been expected to enjoy. His ability to do even simple thingslike swim, drive a car on a vacation trip, or walk through an amusement parkhas been severely restricted. However, we find that the trial court's award was excessive, and we lower it to the highest amount the trial court could have awarded, or $200,000. See and compare Rivere v. Union Pacific Railroad Company, 93 1132 (La.App. 1st Cir.10/7/94), 647 So.2d 1140, writ denied, 95-0292 (La.3/24/95), 651 So.2d 295, in which a 22-year-old plaintiff, whose schooling was interrupted, received $75,000 for loss of enjoyment of life after being left with permanent partial disabilities that affected his lifestyle significantly following a truck-train collision.

CONCLUSION
While we conclude that portions of the trial court's award for general damages were in the upper range, e.g., the elbow, we are unable to find that the trial court abused its vast discretion. As to the portions that we found were abusively high, we amend the trial court judgment in the following respects: the award of $150,000 for bulging discs is reduced to $75,000; the award of $150,000 for scarring and disfigurement is reduced to $100,000; and the award of $250,000 for enjoyment of life is reduced to $200,000. This reduction of $175,000 brings the amount of the total judgment to $3,660,352. In all other respects, the judgment is affirmed.
Accordingly, the judgment of the trial court is amended, and, as amended, affirmed. Costs of this appeal are assessed to RPM Pizza, LLC, d/b/a Domino's Pizza.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[2] In brief, RPM Pizza stated that it does not contest the amount of costs and fees if the court determines on appeal that an assessment of costs and fees against it is appropriate.
[3] Killingsworth testified that he did not include this information in the report because he knew that he would be deposed. Both of his depositions were proffered at the hearing and he was questioned extensively about their contents.
[4] In his deposition, he also computed other possible speeds for the motorcycle which ranged from 35.7 mph to 102.7 mph. He also stated that since writing his report, he had decided that the minimum average speed of the motorcycle was 77.9 to 81.1 mph, assuming a turn calculation of 1.26 seconds.
[5] Both Dr. Gleason and Dr. Holladay testified about measurements they took during their physical exams of the plaintiff. While the numbers were not identical, they clearly demonstrated that the plaintiff's right arm and thigh were smaller than the left ones.