MOORE, J.
 

 | ,The defendant, Talco Midstream Assets Ltd. (“Talco”), a pipeline construction company, appeals a ruling denying its motion for new trial and the default judgment in which the trial court awarded the plaintiffs over $200,000 in damages. Talco seeks a remand for a new trial on the merits, or alternatively, a reduction in the damages awarded. For the following reasons, we affirm the judgment denying Tal-co’s motion for new trial, but modify the damage award.
 

 Procedural History
 

 Previously, in
 
 Pollock v. Talco Midstream Assets Ltd.,
 
 44,629 (La.App. 2 Cir. 9/23/09), 22 So.3d 1033, a panel from this court remanded this case for a hearing on Talco’s motion for a new trial, which the trial court had denied on grounds that the motion constituted a procedurally improper attempt to annul the judgment for an “ill practice” under C.C.P. art. 2004. The panel reversed the trial court, holding that the “ill practice” grounds for nullification could be considered in a motion for new trial, and it remanded the case to the trial court for a contradictory hearing.
 

 The hearing was held on May 10, 2010, where the court took evidence and testimony and the parties filed post-trial briefs. On May 17, 2010, for reasons orally assigned, the trial court found no grounds for a new trial. Specifically, the court determined that a letter from plaintiffs’ counsel to Talco’s senior vice-president, which stated, “This matter has not been resolved. Please file your answer at this time,” was sufficient to put Talco on notice that the plaintiffs were moving forward with their lawsuit and the prior agreement not to take a default judgment without a 10-day notice fallowing Talco time to file an answer was no longer in effect. The court also found that the default judgment was not obtained .by fraud or ill practice resulting from this alleged “miscommuni-cation.”
 

 Talco filed this appeal.
 

 FACTS
 

 The dispute arose out of Talco’s construction of a pipeline across Ms. Dorothy Pollock’s property. Ms. Pollock, age 92, lives in her own home on a 29.5-acre rectangular lot measuring 350' x 3665'. Two grandsons and a daughter, Shirley Loe, also own and reside in homes located on the property. Access to the homes is provided by a well-established (25 years), long gravel driveway several hundred yards long beginning from Blanchard-Furrh Road, crossing a land bridge, and ending at the homes of Ms. Pollock’s two grandsons, Mike and Matt Loe. The road forks off with driveways to Ms. Pollock’s home and her daughter’s home. An asphalt apron measuring 12 x 20 feet provides the transition from Blanchard-Furrh Road to the gravel drive.
 

 Prior to construction of the pipeline, the land bridge consisted of a concrete culvert under the driveway located midway through the rectangular lot. The culvert was placed in that location 25 years ago to facilitate the natural drainage of the property in that area, which is part of the Cross Lake watershed.
 

 In April or May of 2006, Talco began constructing a pipeline across Ms. Pollock’s property. According to the plaintiffs, Talco had no legal right of way over
 
 *839
 
 the property and thus attempted to get Ms. Pollock to sign a |sright-of-way document in exchange for $8,789.53. Mrs. Pollock refused the offer (Talco contends that it had obtained the right-of-way from the mineral servitude owner). Talco continued to construct the pipeline on the property to completion. The plaintiffs filed this lawsuit on April 18, 2007, to enjoin construction of the pipeline, and for restoration of the property and damages.
 

 Plaintiffs alleged that Talco destroyed the land bridge and replaced the concrete culvert with two smaller aluminum culverts that were inadequate to handle the water flow, and which subsequently washed out, causing the property to flood and become impassable for an extended period. They alleged that the heavy equipment used by Talco destroyed the asphalt apron, damaged the driveway and created large ruts in the property, further creating drainage problems.
 

 After the petition was filed and service obtained, Talco’s senior vice-president, Mr. Allen Matysiak, contacted the Pollocks’ attorney, Thomas Wilson, requesting an extension of time to file an answer. He requested that the parties try to resolve the matter before proceeding further and promised he would facilitate further negotiations to reach a possible settlement. Wilson and Matysiak agreed to meet on May 14, 2007 to discuss a settlement. In return, Wilson sent a letter dated May 2, 2007, promising he would not take a default or any adverse action against Talco without first giving Talco 10 days’ advance written notice. Wilson was unable to attend the meeting, however, so he sent a second letter on May 14, 2007, to Matysiak assuring him that the prior agreement would remain in effect and |4he would take no adverse action without giving the 10-day notice.
 

 The settlement conference was rescheduled for August 29, 2007. Matysiak did not appear at the meeting, but sent emissaries Victor Davis and Ted Lyles to meet with attorney Wilson. Wilson alleges that he offered to settle the matter for a sum that mostly represented the cost of repair and restoration of the property. He states that Davis told him that he had no authority to offer more than the amount previously offered to Mrs. Pollock.
 

 Davis subsequently visited the property and called Wilson stating that he saw nothing to support the settlement demand. He offered to fix a leaky water line and the same monetary amount previously extended. No other meetings were held.
 

 On October 19, 2007, with no agreement having been reached amidst the continuing problems on the property, Wilson sent Ma-tysiak a letter advising: “This matter has not been resolved. Please file your answer at this time.”
 

 The central question in this case is whether the October 19, 2007, letter above effectively served as a 10-day written notice to Talco required by the agreement that it was at peril of a default judgment, or whether the letter constituted notice that the agreement to provide such notice was no longer in effect. Wilson contends that the letter was obviously meant to be a termination of the agreement to provide an extension of time afforded Talco. Conversely, Talco asserts that it believed counsel’s letter was simply an informal request to orchestrate a resolution, not a notice that the Pollocks were reviving the previously instituted suit. Talco further notes that two of | .fits representatives met with Pollock’s counsel following the October 19 letter and that additional proposals were made, although these allegations are disputed by Pollock. Talco also sent the following letter to Pollock’s attorney on
 
 *840
 
 October 26, 2007, which it deemed an “answer” to the October 19 letter:
 

 We do agree to come back and repair the water line one more time and reissue draft or a check for bonus as agreed between the landowner and Right-Of-Way agent. Please advise if this is acceptable.
 

 On December 3, 2007, Wilson caused a preliminary default to be entered. On September 22, 2008, nearly 10 months later, the default judgment was confirmed, with the court rendering judgment against Talco in the amount of $201,900.00, plus interest and costs. A written judgment in accordance with the oral ruling was signed on September 80, 2008. Notice of the judgment was served on Talco on October 9, 2008.
 

 On October 15, 2008, Talco filed a motion for new trial based on the circumstances under which the default judgment was obtained. Talco argues that it never received the 10-day notice promised by Pollock’s counsel and that the October 19, 2007, letter was insufficient to constitute such notice.
 

 As stated above, without hearing any testimony or reviewing the letters referenced above, the trial court denied Talco’s motion for new trial on grounds that it was procedurally improper to use the motion for a new trial for what was essentially an action to nullify a judgment. The defendant appealed, and this court reversed and remanded the case for a contradictory hearing on the motion for a new trial, holding that the motion for new trial | ¿was a proper procedural vehicle to annul a default judgment for ill practice. After the hearing, the trial court denied the motion for new trial.
 

 DISCUSSION
 

 Talco raises three assignments of error.
 

 By its first assignment, Talco contends that the trial court erred in failing to grant its motion for a new trial when good grounds for such exist. The issue, it argues, is whether the agreement expressed by Wilson that he would “not take a default judgment ... without giving you at least 10 days advance written notice” during their attempted resolution of the dispute was effectively abrogated by counsel’s subsequent letter which stated, “This matter has not been resolved. Please file your answer at this time.”
 

 La. C.C.P. art. 1973 provides in pertinent part:
 

 A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.
 

 In applying La. C.C.P. art. 1973, the court must examine the facts and circumstances of each individual case. When an examination of the facts convinces the trial judge that the judgment would result in a miscarriage of justice, a new trial should be ordered.
 
 Lamb v. Lamb,
 
 430 So.2d 51 (La.1983);
 
 Hickman v. Wm. Wrigley, Jr. Co.,
 
 33,896 (La.App. 2 Cir. 10/4/00), 768 So.2d 812. Although the trial court has much discretion in determining if a new trial is warranted, an appellate court can set aside the ruling of the trial judge in a case of manifest abuse of that discretion.
 
 Lamb, supra; Hardy v. Kidder,
 
 292 So.2d 575 (La.1973);
 
 Hickman, supra.
 
 Due to the general policy considerations weighing in the defendant’s favor that every litigant should be allowed his day in court, appellate courts must be 17particularly cautious in examining the circumstances underlying a properly confirmed default judgment when a timely motion for new trial is denied thereafter.
 
 Lamb, supra; Hickman, supra.
 
 He who seeks to have a default judgment against him set aside must allege and prove that he had good reasons for his nonappearance
 
 *841
 
 and failure to timely plead.
 
 Meshell v. Russell,
 
 589 So.2d 86 (La.App. 2 Cir.1991).
 

 The main thrust of Talco’s argument is that it had good reason for failing to file an answer. This reason, it argues, is that there was a “miscommunication” between Matysiak and Wilson. When Matysiak received the Oct. 19, 2007, letter from Wilson telling him to “file his answer” because the dispute had not been resolved, he testified that he understood this as “him (Wilson) asking me for what we were going to do to take care of the matter.” He believed that the parties were still negotiating. He thus responded by sending plaintiffs’ counsel a settlement offer on Oct. 27, 2009. He also testified that he did not understand the letter to indicate that the plaintiffs intended to take any adverse action against Tal-co, nor did he think the letter called for a responsive legal pleading to be filed at the courthouse.
 

 Talco further argues that Matysiak is not an attorney and did not understand that the “answer” called for in the letter was an answer to the petition. Had he known that the prior agreement was off, Talco argues, Matysiak would not have continued to try to negotiate, but would have sent the file to Talco’s corporate counsel.
 

 The plaintiffs challenge this explanation, noting that Matysiak is a | ¡^sophisticated businessman and understands legal pleadings. They also note that the offer was simply the same offer rejected more than a month earlier on September 6, 2007, implying that Talco was not serious about reaching a settlement.
 

 In
 
 Meshell v. Russell, supra,
 
 a case cited by Talco, the plaintiff obtained a default judgment against Russell for failure to answer and appear in a lawsuit arising out of an automobile accident. Upon service of the petition, Russell immediately turned the petition over to his insurance agent, who assured Russell that they would provide a defense of the suit and file responsive pleadings. However, due to a misunderstanding between the home office and the agent/adjuster regarding who would engage an attorney to handle the case, no answer was filed. During this time the plaintiffs, by ex parte motion, had the action transferred from Sabine Parish to DeSoto Parish, where they subsequently obtained a default judgment against Russell that far exceeded his liability insurance coverage. Russell timely filed a motion for new trial, arguing that the failure to answer was not his fault, but was due to the miscommunication involving his insurer. The trial court denied the motion, noting that it would be a substantial miscarriage of justice to allow the defendants to profit from their own neglect. Russell appealed.
 

 On appeal, we held that the trial court abused its discretion in denying the motion for a new trial on grounds that Russell was prejudiced by the plaintiffs failure to serve Russell with a copy of a motion to transfer the case from Sabine Parish to DeSoto Parish that stated that no answer had 19been filed as of that time, and which would have given Russell notice that something was wrong. We also found deficiencies in the evidence presented at the confirmation of the default, including unsworn medical reports and nursing expenses. Finally, we noted that Russell was prejudiced by the miscommunication between his adjuster and insurer, and therefore the trial court abused its discretion in denying the motion for a new trial. The default judgment was reversed by our court.
 

 In
 
 Cashback Inc. v. Herring,
 
 27,805 (La.App. 2 Cir. 2/28/96), 669 So.2d 693, we held that the trial judge abused his discretion in failing to grant a new trial where several factors indicated that the defendant was taking steps to defend the lawsuit and that
 
 *842
 
 a miscarriage of justice would result by depriving him of his day in court. These factors included the following:
 

 1) Although defendant had not filed an answer in the case, he had attended a deposition and produced requested documents connected with the present action.
 

 2) Plaintiffs counsel was aware the defendant was seeking representation, and intended to defend the suit.
 

 3) A settlement offer regarding the suit was still on the table.
 

 4) Plaintiffs counsel agreed with defendant’s attorney to an extension of at least two weeks in order to allow the defendant to seek the services of another attorney, and thus was aware the defendant intended to seek counsel and defend the suit.
 

 5) The defendant diligently sought representation in this matter by contacting Byron Richie, who, in turn, prior to confirmation of the default, contacted plaintiffs counsel to discuss the case.
 

 6) The trial judge specifically found that neither Richie nor plaintiffs counsel was at fault for their beliefs as to whether an extension had been secured. Therefore, there was a misunderstanding as to whether an additional extension was granted.
 

 |inWe concluded that, under the circumstances, the defendant could reasonably have believed that his interests were protected, and that he had additional time to secure counsel and answer the suit. Although defendant’s initial counsel did not formally enroll as counsel, he handled the settlement negotiations and took steps to protect the defendant. The defendant contacted a new attorney, Mr. Richie, six days after dismissing his initial attorney. Richie sought an extension of time to answer the suit, but there was apparently a misunderstanding between the two attorneys; however, the defendant reasonably relied on an assurance that he still had time in which to file an answer. The facts in the record thus showed that the defendant was taking steps to defend the suit, and did not merely fail to file a timely an answer. Therefore, we concluded that a miscarriage of justice would result by depriving the defendant of his day in court.
 

 In both
 
 Meshell, supra,
 
 and
 
 Cashback, supra,
 
 a miscommunication was only one among several facts that prejudiced the defendant and led the courts to conclude that it would be a miscarriage of justice to deny the defendants the opportunity to defend the respective suits. By contrast, in
 
 Hickman, supra,
 
 we found no abuse of discretion in the trial court’s decision to confirm a default judgment in favor of the plaintiff and deny the defendant’s motion for new trial where the miscommunication between the defendant and his agent for service of process, CT Corporation, caused a human error in failing to file an answer to the suit. The alleged miscommunication is not explained in the opinion; however, the defendant filed an affidavit not considered by the trial court attesting that its attorneys | nwere attempting to negotiate a settlement prior to the lawsuit. We found no error in the trial court’s failure to consider the affidavit.
 

 In the instant case, we cannot conclude that a miscommunication actually occurred. At the very least, a reasonable construction of the sentence, “Please file your answer at this time,” should have put Matysiak on notice that the plaintiffs intended to proceed with the lawsuit and Talco needed to file an answer to the petition. While it is arguable that, standing alone, the word “answer” could be ambiguous, when the word is used in the context of the phrase, “file your answer,” the ambiguity vanishes. The expression “file your answer” clearly communicates the command to file a responsive pleading
 
 *843
 
 and cannot reasonably be confused with “respond” or “give your answer.”
 

 We further conclude that the letter telling Talco to “file an answer at this time” served as sufficient written notice to Talco that it was at peril for any adverse action by the plaintiffs after 10 days. Talco contends that had Matysiak known that the letter demanded that a responsive pleading be filed or risk default, he would have turned it over to in-house counsel. On the contrary, we think a prudent corporate businessman would have recognized the import of the letter and taken the necessary steps to defend the lawsuit, including immediately turning the matter over to corporate counsel. His failure to take these steps was an error in judgment. Mere human error is not enough to show that a miscarriage of justice would result if a new trial is not granted.
 
 Hickman, supra.
 
 Accordingly, we do not find that the trial court abused its discretion in failing to grant a new trial on this basis. This | ^assignment of error lacks merit.
 

 By its second assignment of error, Talco argues that obtaining the default judgment constituted an “ill practice” under La. C.C.P. art. 2004. The argument is that plaintiffs’ counsel lulled or misled Mr. Matysiak into thinking that the plaintiffs’ counsel would not seek a default judgment without giving 10 days’ notice of his intent to do so. Talco contends that plaintiffs’ counsel should have told Mr. Matysiak that it was no longer interested in negotiating a settlement and that it was proceeding with the suit, especially since Talco had given every indication that it wanted to resolve the matter.
 

 Because we have concluded that the plaintiffs’ October 19, 2007, letter expressly and unambiguously informed Talco that it needed to file an answer to the petition, and therefore implicitly gave Talco the required notice that they intended to proceed with the lawsuit, the agreement to give 10 days’ notice prior to taking a default was both fulfilled and terminated by the letter. The agreement was fulfilled because the plaintiffs waited six more weeks for Talco to file an answer to the petition before entering a preliminary default on December 3, 2007. Since the purpose of the agreement was to allow Talco a temporary but indefinite extension to file its answer without risk of default while it attempted to resolve the matter, once Wilson informed Talco that no resolution to the dispute had been reached and it was time for Talco to file its answer, the agreement was effectively abrogated as to any future notices.
 

 For this reason, we conclude that the facts of this case are not 11sanalogous to that line of “ill-practice” cases that would have required Wilson to give further notice that it intended to confirm the preliminary default.
 
 See, e.g. Power Marketing Direct Inc. v. Foster,
 
 2005-2023 (La.9/6/06), 938 So.2d 662;
 
 Russell v. Illinois Central Gulf R.,
 
 96-2649 (La.1/10/97), 686 So.2d 817;
 
 Kem Search Inc. v. Sheffield,
 
 434 So.2d 1067 (La.1983). These cases stand for the proposition that an ill practice does not necessarily entail fraud or an intentional act, but also includes any improper practices or procedures which operate to prevent an opposing party from having an opportunity to appear or assert a defense and enforcement of the default judgment would be unconscionable and inequitable.
 
 Power Marketing Direct Inc. v. Foster, supra.
 

 In
 
 Kem Search, supra,
 
 the court held that it was an “ill practice” when the plaintiff did not give the defendant notice that he intended to take a default judgment even though settlement negotiations were ongoing. The court found that the defendant was unfairly deprived of his opportunity to present his defenses and enforce-
 
 *844
 
 merit of the default judgment would be unconscionable and inequitable where the defendant failed to file a responsive pleading “due to his mistaken and
 
 not unreasonable impression
 
 that the plaintiff would give him an opportunity to file pleadings if his settlement overtures were rejected,” and it was the local court custom that an attorney should not confirm a default judgment without prior notice to the defendant.
 
 Id.
 
 at 1072 (emphasis ours).
 

 In
 
 Russell, supra,
 
 the court held it was an ill practice for the plaintiffs attorney to obtain a default judgment without attempting to notify 114the opposing attorney when the opposing attorney has
 
 participated in the litigation proceedings
 
 and inadvertently failed to file an answer to the plaintiffs second amended petition.
 
 Id.
 
 at 819. The court also noted that the defendants were actively attempting to defend their rights.
 
 Cf Cashback, Inc., supra.
 

 Most recently, in
 
 Power Marketing, supra,
 
 the court held that it was an ill practice under La. C.C.P. art. 2004 for the plaintiff to confirm a default judgment in a Louisiana suit without prior notice to the Ohio defendant who was actively participating in litigation against the plaintiff in an Ohio lawsuit arising out of the same contractual dispute. The court stated that Art. 2004 is broad enough “to encompass all situations wherein a judgment is rendered through some improper practice or procedure which operates, even innocently, to deprive the party cast in judgment of some legal right, and where enforcement of the judgment would be unconscionable and inequitable.”
 
 Id.
 
 at 673. The test endorsed by the court in
 
 Power Marketing
 
 was derived from
 
 Kem Search, supra,
 
 and
 
 Russell, supra,
 
 which found that it was an ill practice for an attorney to obtain a default judgment without attempting to notify the opposing attorney when the opposing attorney had “participated in the litigation proceedings” and the defendants were “actively attempting to defend their rights.”
 
 Id.
 

 We conclude that the facts and circumstances in the cases discussed above are clearly inapposite to those in the instant case. In
 
 Russell,
 
 the defendant had appeared and filed answers to the previous petitions, but inadvertently failed to file an answer to the plaintiffs second amended 11fipetition. Clearly, he was actively involved in the litigation and attempting to defend his client’s rights. In
 
 Power Marketing,
 
 the defendants were actively engaged in litigation with the plaintiff in Ohio. The dispute arose out of a contractual agreement which had a choice of law and choice of forum clause that named Ohio as the proper forum to litigate. Thus, when the Louisiana defendant filed his own countersuit in Louisiana, he was in violation of the agreement and the Ohio defendant refused service. The Louisiana plaintiff subsequently confirmed a default judgment without giving notice to the Ohio defendant. The supreme court reversed on grounds that the defendant was actively involved in the litigation, albeit in Ohio.
 

 Finally, in
 
 Kem Search, supra,
 
 Kem Search filed suit on open account against Sheffield for sums due. When Sheffield was served a copy of the petition in his Alexandria office on March 18, 1980, he telephoned Kem Search’s Baton Rouge attorney, which resulted in a letter agreement dated March 28, 1980, and which would allow Sheffield additional time to hire an attorney to file responsive pleadings. Sheffield named his probable counsel in the letter, but suggested that the parties meet in the next week to attempt to reach a settlement prior to filing an answer. Sheffield asked Kem Search’s attorney to advise him “[i]f you feel we should file responsive pleadings.” Kem Search’s attorney responded by letter stat
 
 *845
 
 ing that he “would like to have an answer filed in the record so we can proceed as rapidly as possible should our discussions fail to be productive.”
 
 Kem Search, supra,
 
 at 1069. The following month, on May 22, 1980, Kem Search’s attorney entered a preliminary default. Three weeks later, he confirmed the default without notifying Sheffield, although he did call the Baton Rouge attorney whom Sheffield said he would probably hire, but as of that time, that attorney had not heard from Sheffield. The court concluded that enforcing the default judgment would be unconscionable and inequitable because Sheffield’s failure to act was “due to his mistaken and not unreasonable impression that Kem Search’s attorney would give him an opportunity to file pleadings if settlement overtures were rejected.”
 
 Id.
 
 at 1071.
 

 By contrast, in the instant case, we find that it was unreasonable for Matysiak or Talco not to file an answer after Wilson sent Matysiak a letter that unambiguously told him to do so. Additionally, according to Wilson, after rejecting Talco’s offer on September 6, 2007, he told Mr. Davis that he should turn the case over to an attorney. The October 19, 2007, letter followed. Matysiak responded with the same offer that was made on September 6. No further communications occurred thereafter. Wilson waited a month before entering a preliminary default and waited another 10 months before confirming the default. It is obvious that Talco was neither actively participating in the litigation, nor in settlement negotiations, nor attempting to defend, as opposed to avoid, the lawsuit. Under these circumstances, we do not find it unconscionable to enforce the default judgment. Accordingly, we reject Talco’s contention that confirmation of the default constituted an ill practice. This assignment is without merit.
 

 Turning now to the damages, Talco contends that the damages are [ 17excessive and punitive. The trial court awarded total damages of $201,900, which included damages for restoration of the property, general damages for inconvenience and expert witness fees. After review of the facts upon which this award was based, we conclude that the general damage award of $1,000 per month for 86 months for Mrs. Pollock’s grandchildren, Matt Loe and Mike Loe, was excessively harsh, and therefore constituted an abuse of discretion.
 
 [1]
 

 General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty, including pain and suffering.
 
 Hunt v. Safeway Ins. Co.,
 
 35,806 (La.App. 2 Cir. 12/5/01), 804 So.2d 724. The discretion vested in the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1;
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257 (La.1993), ce
 
 rt. denied,
 
 510 U.S. 1114,114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
 
 Hunt, supra.
 

 Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reason
 
 *846
 
 ably awarded, while an abusively high award is | ^reduced to the highest amount the trier of fact could have reasonably awarded.
 
 Hunt, swpra.
 
 The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact.
 
 Locke v. Young,
 
 42,703 (La.App. 2 Cir. 12/12/07), 973 So.2d 831;
 
 Manuel v. State Farm Mutual Automobile Co.,
 
 30,765 (La.App. 2 Cir. 8/19/98), 717 So.2d 277.
 

 The basis for the general damages was the aggravation and inconvenience all the plaintiffs suffered as a result of this incident. In this instance, Mrs. Pollock, who was 92 years old, obviously suffered more inconvenience than the other plaintiffs because the property is hers. For this reason, we will not disturb the general damage award in her favor.
 

 All of the other plaintiffs suffered the extreme inconvenience of living on partially flooded and damaged property, with access to their homes made generally inconvenient and sometimes impossible. Nevertheless, we conclude that $1,000 per month for this inconvenience is simply too speculative and excessive for this type of “pain and suffering.”
 
 [2]
 
 119Accordingly, we reduce the general damages to Mike Loe and Matt Loe from $1,000 per month to $500 per month for the 36 month period, which reduces the entire damage award by $36,000. The resulting damage award represents the highest amount of general damages the trial court could have reasonably awarded for the inconvenience caused in these circumstances.
 

 We find no abuse of discretion for all other damages awarded in the judgment. Accordingly, those damages are affirmed.
 

 CONCLUSION
 

 For the foregoing reasons, we affirm the default judgment obtained by plaintiffs and affirm the denial of the motion for new trial. We amend that part of the general damage awards in favor of Matt Loe and Mike Loe, reducing those awards by half to $18,000 each. In all other respects, the judgment is affirmed. All costs are assessed against the appellant.
 

 AFFIRMED AS AMENDED.
 

 [1]
 

 . We also note that the trial court did not award Shirley Loe damages. We are unable to determine the reason for this from the record, and she did not answer this appeal.
 

 [2]
 

 . There are few comparable property damage cases. In
 
 Collins v. City of Shreveport,
 
 35,172 (La.App. 2 Cir. 10/31/01), 799 So.2d 630, the trial court awarded general damages of $7,500 for mental anguish where the plaintiff's home was flooded by rising water as a result of trash, debris and tree limbs accumulating in a poorly maintained city drainage ditch. We held that the damage award was not appropriate for mental anguish because there was no evidence of "psychic trauma,” as a result of the property damage. However, we held the award was appropriate compensation for inconvenience as a result of the flood.
 
 See also, Davis v. Culpepper,
 
 34,736 (La.App. 2 Cir. 7/11/01), 794 So.2d 68 (Court awarded $2,500 in damages for inconvenience, mental anguish, and harassment aris-mg out of trespass, property damage to land and road built on plaintiff's property). In
 
 Boudreaux v. State, DOTD,
 
 2004-0985 (La.App. I Cir. 6/10/05), 906 So.2d 695, the trial court awarded each of 1286 plaintiffs in a class action suit $32,552 for mental anguish (psychic trauma assumed under the circumstances) for flooding of their homes and property due to a negligently constructed bridge that disrupted the flood plain. However, in
 
 Booth v. Madison River Communications,
 
 2002-0288 (La.App. 1 Cir. 6/27/03), 851 So.2d 1185, the court awarded $0 damages due to lack of evidence for mental anguish caused by trespass, invasion and destruction of landowner's property arising out of a communications company laying cable across his property-